Argued December 15, 1915, affirmed January 11, rehearing denied May 16, 1916.

# MUIR v. MORRIS.

(154 Pac. 117; 157 Pac. 785.)

**Attorney and Client—Additional Compensation—Consideration.**

1. Where plaintiff was employed by defendants as an attorney at a monthly salary, which had been fixed in advance, their statement to him that they realized he was underpaid, but that if he would do his best to promote their ventures, and such ventures should prove successful he would receive a substantial reward, did not create a legal obligation on defendants; since such offer was based on no consideration.

**Evidence—Best and Secondary—Memorandum.**

2. In an action for such reward, the contents of a memorandum made by defendants in fixing the reward could not be orally proved by plaintiff from memory, refreshed by a memorandum made by him while the matter was clear in his mind, where no showing was made to account for not producing the original memorandum.

**Evidence—Parol Evidence—Contracts.**

3. Where plaintiff in such action alleged that defendants fixed the reward in their agreement of dissolution of their firm, at 1,000 shares of stock in a power company controlled by them, but the dissolution contracts contained no provision relating thereto, plaintiff could not prove the inclusion of such provision in oral negotiations preceding the contracts, since such negotiations being merged in the written contracts, evidence thereof was inadmissible, under Section 713, L. O. L., prohibiting parol variance of written instruments. ·

**Evidence—Parol Evidence—Persons Bound by Contract.**

4. Plaintiff could not, on the ground that he was not a party to such dissolution contract, rely on conditions or consideration *dehors,* to support his claim to such reward, since, there being no binding obligation on defendants therefor unless embodied in the written contracts, plaintiff must recover as a privy to such contracts or not at all.

**Evidence—Parol Evidence—Consideration.**

5. Where, in such dissolution contracts, the consideration provisions were contractual in their nature and not merely monetary, and the contracts were otherwise complete, leaving nothing more to be said, plaintiff could not as a privy show that the real consideration was different from that expressed.

**Evidence—Parol Evidence—Consideration—Recital—Effect.**

6. The general rule is that the written recital of a contractual consideration excludes the idea that any other agreements are to be performed or of there being any other consideration.

**Evidence—Documentary Evidence—Parol Evidence.**

7. Where a written instrument transferring corporate stock recited that the consideration was the assignment to the assignor of certain other stock and the agreement of the assignees to pay a note, such consideration cannot be enlarged, by a third person seeking to show another agreement beneficial to himself, by showing that there was a parol agreement that the assignees, should do something more.

[As to parol evidence of conditions in notes and bills, see note in 128 Am. St. Rep. 609.]

**Evidence—Documentary Evidence—Parol Evidence.**

8. Where written instruments relating to a dissolution of partnership itemized the liabilities which one partner was to assume and enumerated in detail the debts which the others were to pay, parol testimony was inadmissible to explain such writings.

**Evidence—Parol. Evidence—Agreement Dissolving Partnership.**

9. Where an agreement dissolving a partnership, under which its attorney's widow claimed extra compensation, made no reference to the payment of such additional compensation to the attorney, or to the issuance of corporate stock to him, though the writings evidencing the agreement precisely detailed the engagements of the several partners, the widow could not, by parol evidence, impose upon the continuing partners defendants an obligation not created by any of the writings.

From Multnomah: HENRY E. McGINN, Judge.

Department 2. Statement by MR. JUSTICE BURNETT.

This is an action by Jane W. Muir, as executrix of the estate of William T. Muir, deceased, against James H. Morris and Fred S. Morris, individually and as partners doing business under the firm name and style of Morris Bros. The facts are as follows:

William T. Muir, plaintiff's deceased husband, whom for brevity we style "Muir," began this action to recover $65,000, as money had and received by the defendants to his use, which he claimed was the proceeds of a sale by the defendants of 1,000 shares of stock in the Oregon Water Power & Railway Company held by them in trust for him. Muir died November 4, 1911, and the present plaintiff was substituted in his stead. Other personages figuring in the transactions culminating in this litigation may be thus described: Morris & Whitehead was a Colorado banking corporation, which we designate as "the bank," the stock of which was owned by the defendants Morris. It engaged in promoting and operating various railway and water enterprises, and dealt in corporate and municipal bonds and other securities. Morris Bros. & Christensen was a partnership composed of James H. Morris, Fred S. Morris, and Julius Christensen, which we call "the firm," and which took over all the assets and business of the bank, continuing its existing enterprise and engaging in new ones. Among the concerns promoted by the bank and the firm was the Oregon Water Power & Railway Company, an Oregon corporation called herein the "Power Company," with 20,000 shares of stock, each of the par value of $100, all of which, except four shares issued to that number of individuals, including Muir, to enable them to qualify as directors, was originally

issued to Fred S. Morris as a representative of the bank. The latter concern and its successor, the firm, always owned a very large majority of the stock of the Power Company until it and its property were sold to the Portland Railway, Light & Power Company, another corporation in this state.

In substance, the complaint states that Muir served the bank and the firm as an attorney until the dissolution of the latter, and afterward performed the same duty to the defendants at an agreed monthly salary in money which all his employers frequently said was inadequate compensation for the services he rendered, and that if he would continue in their employment he should receive additional compensation in the form of an interest in the property shares of stock, profits and business of the Power Company and other corporations owned and operated by them, provided the enterprises were successful, the amount of which reward was to be afterward determined. It is charged that this stipulation was made both by the bank and its successor, the firm, that Muir continued to work for the small salary, and that he fully performed all the conditions of his employment on his part until the Power Company was finally sold as stated. Substantially, the plaintiff avers that about November 7, 1904, the members of the firm agreed among themselves that Muir's additional compensation should consist in the issuance to him of 1,000 shares of the Power Company stock, but that although stock was issued to other employees of the firm, none was issued to him. The foregoing is a condensation of a very extended recitation of matter of inducement leading up to the crux of the complaint found in the thirteenth paragraph, which we adapt to the limits of an opinion thus: That thereafter, about June 26, 1905, the firm

was dissolved; that before and at the time of such dissolution, as an inducement thereto and as part of the contract of dissolution, it was then agreed between Christensen, on the one hand, and the defendants herein, on the other, that the 1,000 shares of Power Company stock which the firm had determined to deliver to Muir should be and was his property, to which he was entitled in payment of the extra compensation mentioned; that defendants here should issue the same to him, and that in consideration thereof Christensen agreed to satisfy certain eastern creditors of the firm, and did then and there assign to these defendants all his stock and interest in the Power Company. It is further averred that about that time the defendants formed the partnership of Morris Bros. through which they acquired and assumed control of the Power Company and all its stock and so continued until about April 27, 1906, when they sold all the stock to the Portland Railway, Light & Power Company at $65 per share, which was paid to them, and that they retained the sum of $65,000 received for the 1,000 shares they had agreed to issue to Muir. For this amount, with interest, judgment is demanded.

The answer admits that Muir was in the employment of the bank, the firm, and Morris Bros. successively; that the firm succeeded to all interests of the bank; that Morris Bros. took over from the firm part of the Power Company stock, being all the firm's interest therein, agreeing to pay part of the firm's liabilities, and that afterward Morris Bros. sold all the Power Company stock owned by them, and did not pay Muir the $65,000 claimed by him. Otherwise the complaint is traversed in all material particulars.

Affirmatively the defendants allege that about December 18, 1908, they had an accounting with Muir

covering all the transactions described in the complaint, as a result of which they paid and discharged all demands which he had against them. A second defense is in substance as follows: That about February 15, 1901, Muir entered the employment of the bank at an agreed monthly salary, later serving the firm in the same capacity until its dissolution, and afterward the defendants, composing a firm of Morris Bros. until May 1, 1906, all at a stipulated compensation per month; that during all this time he was working under contract for an agreed salary and for no other compensation, and that long prior to the beginning of this action Muir had been paid in full for all the services rendered as set out in the complaint.

It is further stated that these defendants and Muir were personal friends, and that on account of a desire to help him, and not because of any legal obligation resting upon them, Fred S. Morris, representing in Oregon the bank and the firm, told Muir that if the Oregon ventures proved profitable he would not be forgotten, but would be enabled, out of the various enterprises mentioned, to reap benefit above and beyond the agreed salary which he was paid; that when the firm was dissolved, the defendants were owners of all the stock of the Power Company, except 1,387 shares; that 5,000 shares had been deposited with Eugene Ivins as collateral for $100,000 loaned by him to the firm; that Ivins had an option also to purchase the stock while still unredeemed for $50 per share; that on account of the friendship to Muir and in pursuance of the statement they had made to him, Fred S. Morris indorsed his note for $25,000, with which Muir took up 1,000 shares of stock pledged to Ivins, applying the money in payment of the Ivins loan, and that afterward the defendants sold the stock with their

own, paid Muir's note and gave him $15,000 of money realized from the sale, being the $15 per share in excess of the option price extended to Ivins. The reply traversed the new matter of the answer in important particulars. In his testimony, however, Muir admitted receiving the $15,000 as profit on the sale of the 1,000 shares of Power Company stock redeemed from Ivins, but contended it was a transaction distinct from the one on which this action is founded. At a trial before a jury, the Circuit Court, at the close of the testimony for the plaintiff, entered a judgment of nonsuit on the motion of the counsel for the defendant and the plaintiff appeals.     AFFIRMED.    REHEARING DENIED.

For appellant there was a brief over the names of *Mr. Ralph E. Moody, Mr. Kenneth L. Fenton, Mr. William D. Fenton* and *Mr. Ben C. Dey,* with oral arguments by *Mr. Moody* and *Mr. Kenneth L. Fenton.*

For respondents there was a brief over the names of *Mr. John M. Gearin, Mr. Charles W. Fulton, Messrs. Teal, Minor & Winfree* and *Mr. W. A. Johnson,* with oral arguments by *Mr. Wirt Minor, Mr. Gearin* and *Mr. Fulton.*

MR. JUSTICE BURNETT delivered the opinion of the court.

1. The precise question to be determined is whether there was any competent evidence to take the case to the jury. Besides the writings hereinafter mentioned, the evidence is found in the deposition of the decedent and the testimony of Julius Christensen and W. H. Hurlburt, the former a member of the firm, and the latter president and general manager of the Power Company while under control of the bank and the firm. Muir admitted as a witness that he entered the em-

ployment of the bank in February, 1901, at a salary of $200 per month, which was agreed upon in advance. He continued under that arrangement until April, 1902, from which date to December 31st of that year he drew a salary of $275 per month. During the year 1903 he received a monthly compensation agreed upon in advance of $400, and afterward until the Power Company was sold, he received $275 per month. He says:

"During this entire time it was frequently stated by Mr. Fred S. Morris, who had charge of the business here and the operations of Morris & Whitehead, bankers, Morris Bros. & Christensen, and Morris Bros., in this territory, that I was inadequately compensated, the statement being commonly that Mr. Brown, Mr. Hurlburt, and myself were all working for inadequate salaries; that this was recognized by our employers, and the purpose was to see that we received additional compensation. There was never anything definite said to me, just how this compensation would be paid; there was no promise of any definite amount, or any particular thing, but there was a continual statement and promise that there was recognition of the fact that I and the other two men spoken of were very much underpaid; that this was appreciated, that they desired me and them to continue and do the very best we could to co-operate with him, making things a success, and upon the successful issue that we would receive substantial reward, putting it in the light that, upon the failure, as I looked upon it, we would not be expected to be additionally compensated, but upon the issue of success we would be, and we were urged in that way, at least I was, to do the very best we could to see that things were made a success."

Giving this testimony its utmost weight it is plain there was nothing in the contemplation of the parties except a possible honorarium unsupported by any legal obligation. Under the contract of employment

80 Or.—25

his services were met by the consideration of his monthly salary settled upon in advance. Having already agreed to render these services, he was bound to perform them, and they could not, as a consideration, support any additional or different contract.

It should be observed that in the thirteenth allegation of the complaint, to which reference has been made, the plaintiff founds her cause of action upon the contract for the dissolution of the firm, and it is stated as an inducement thereto and as part of the agreement of dissolution the defendants promised to issue 1,000 shares of Power Company stock to Muir. The record discloses four written agreements affecting the liquidation of the firm. The first was dated January 31, 1905, and provides in general terms that the partnership should terminate by July 1, 1905, unless continued by mutual written consent; that the indebtedness and liabilities of the firm should be reduced and paid off as rapidly as possible without sacrificing the interests or assets of the concern; and that no more business should be undertaken, the general purpose being to enter upon a course of liquidation and settlement of the affairs of the firm. The original agreement of partnership provided that Christensen should be owner of one fifth of the firm's property, and each of the two Morris brothers should own two fifths of the same, and that the partners should be liable for the firm's indebtedness in like proportion. The next agreement affecting the winding up of the firm's affairs was dated June 26, 1905. By its terms Morris Bros., the defendants here, assumed the payment of the Ivins note of $100,000, turned over to Christensen 647 shares of Catawba Power Company, 6⅔ shares of Warren & Jamestown Street Railway Company, and 2,383 shares of York Haven Water & Power Com-

pany, for which Christensen transferred to them 49 shares of Land Company of Oregon, 2,096 shares of Power Company stock, and all his interest in the 5,000 shares of the latter stock pledged to Ivins, subject to the terms of the pledge and his option to purchase the same at $50 per share. This agreement does not purport to affect the remaining interests of Christensen or Morris Bros. in the Power Company stock or the other assets of the firm still on hand. The next agreement was dated June 27, 1905, and provided that the defendants here, on or before August 1, 1905, should personally discharge without using any of the partnership assets, all the firm's obligations represented by several of its promissory notes, required Christensen to discharge certain other of its obligations, and generally provided for the disposal of the remainder of the firm's assets. The fifth paragraph states that:

"None of the funds or assets of the partnership shall be in any way used by any of the liquidating partners, except as provided herein. The said funds shall be kept separate and apart from and be in no wise commingled with any other funds or assets. All moneys of the partnership shall be deposited in the name of and to the credit of Morris Bros. & Christensen."

Finally, on November 1, 1905, the members of the firm made their last written stipulation, so far as the record discloses, winding up its affairs in detail according to schedules annexed to the document, and apportioned among themselves the liabilities assumed by each. In all these written contracts affecting liquidation of the firm, no mention whatever is made of any obligation to Muir or of his ownership of or right to any of the stock of the Power Company. On

the contrary, as quoted above, they expressly inter-
dicted any use of the assets except as prescribed in
the language of their stipulations. There is no at-
tempt whatever to prove the averment of the complaint
that as early as November 7, 1904, the partners of
the firm had determined to issue any stock to Muir.

2. Plaintiff offered oral testimony to show that in
the negotiations culminating in the agreement of June
26, 1905, the partners set aside 1,000 shares each for
Muir, Brown and Hurlburt, and one share each for
J. Frank Watson and A. B. Croasman. Such prof-
fered evidence is found in the deposition of Muir,
wherein he speaks of having seen a certain yellow
paper memorandum shown him in Philadelphia in
April or May, 1908, by James H. Morris, whereon
were set down in the latter's handwriting 1,000 shares
each for Muir and Hurlburt, and he thinks 2,000 for
Brown, which Morris told him were made when the
agreement of June 26, 1905, was framed so as to de-
termine what would be left of the Power Company
stock to be disposed of between the partners. The
witness Christensen also testified about the same mem-
orandum all over the objections of the defendants.
The plaintiff relies upon this paper to prove the fixing
of the then yet undetermined amount of extra re-
muneration to be awarded to her decedent. If it was
of any value as proof, the paper itself was the best
evidence; but curiously enough, no effort appears to
have been made to produce it or to account for its
absence. Not only so, but Muir, avowing his com-
plete forgetfulness of it, offered as evidence of its
contents part of a written statement made by himself
May 30, 1908, when, as he says, the matter was fresh
in his memory, covering his recollection of the conver-

sation with Morris and the terms of the paper which the latter exhibited to him.

In the light of such cases as *Wiseman* v. *Northern Pac. R. R. Co.,* 20 Or. 425 (26 Pac. 272, 23 Am. St. Rep. 135), *Jones* v. *Teller,* 65 Or. 328 (133 Pac. 354), and *Parker* v. *Smith Lumber Co.,* 70 Or. 41 (138 Pac. 1061), the witness, though clearly remembering the same, could not be permitted to state the contents of the paper, unless some showing was made to account for not producing it. Much less, in the absence of such explanation, could he substitute his own memorandum of his remembrance of its terms.

3. All this, however, as stated in the complaint, was part of, and hence, as a matter of law, was merged in, the written agreement, and cannot affect the conditions thereof as thus finally settled.

We here recite the oft-quoted Section 713, L. O. L.:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings;

"2. Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in Section 717, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

4. The plaintiff argues that she was entitled to show the actual consideration of the contract in question; that she is not bound by its terms, and may show

other conditions supporting her claim. It must be admitted that the talk about other possible additional compensation was not definite enough to constitute a legal obligation. As a corollary to this, it is plain that the amount and manner of additional pay rested solely in the discretion of the employers, and without some definite stipulation supported by sufficient consideration, no liability would accrue against them. It is indispensable, therefore, for the plaintiff to show some such contract. Indeed, this is the avowed theory of the complaint, as stated in the thirteenth paragraph. The plaintiff must therefore claim under the contract of dissolution or not at all. Her demand cannot rise above its source. If the theory of the complaint is sound, Muir was in every sense of the word a privy to the contract of dissolution, both by the allegations of that pleading and the operation of the law. Under the provisions of Section 713, L. O. L., no other evidence is admissible to declare the terms of the contract, except the writing itself. The partners had a right to contract as they chose concerning the assets of their own firm. It is true enough, as argued by the plaintiff, they could have disposed of the personalty of the concern by oral agreement, and have fastened upon it a trust in favor of anyone they chose to mention. But although it is competent to create a trust in chattels by parol, yet it is equally true that when parties have reduced their contract to writing, even about a matter that might have been left to recollection, that instrument is the exclusive standard to which their obligation must be referred. Taken altogether, the contracts already mentioned constitute a complete disposition of all the assets of the firm in detail. They are binding not only upon the parties themselves, but also upon those who claim under them. The writings left nothing to determine respecting the stock in ques-

tion. All the shares were finally and effectively disposed of, nothing remaining to be done. In other words, the contract was complete within itself about all such matters. Therefore, it cannot be varied by parol testimony. The case is essentially controlled by *Oregon Mill Co. v. Kirkpatrick*, 66 Or. 21 (133 Pac. 69), where a similar question was involved. In brief, unless Muir was privy to the contracts involving disposition of the shares in question, he cannot claim the benefit of them. On the other hand, if he was privy to them, he must take them as he found them. In them, however, as before stated, there is no provision for his benefit.

The principle is stated thus by Mr. Chief Justice MOORE in *Pacific Biscuit Co. v. Dugger*, 42 Or. 513 (70 Pac. 523):

"The rule that an instrument in writing cannot be contradicted or varied by parol evidence applies only between the parties and their privies, and cannot be invoked in controversies between third parties and any of the parties to the contract."

In that case a son had executed to his mother a bill of sale of a stock of goods in his possession absolute on its face, but in reality as a mortgage to secure her for moneys which she had advanced to him. The plaintiff, claiming that the son in control of the business was her agent, sued her for the price of certain goods delivered to him and which he had included in the bill of sale. The paper was offered to prove her absolute ownership of the stock of goods. This document was thus drawn in question collaterally between parties, one of whom was a stranger to it, and it was held that she might show the real object of the contract as against the stranger. In such cases as the *American Contract Co. v. Bullen Bridge Co.*, 29 Or. 549 (46 Pac. 138), only the rate of payment and quality of the prop-

erty to be delivered was specified in the offer and acceptance of the parties, nothing being said about the quantity to be furnished. It is plain in such a case that not all the contract is included in the writing, and that the remainder of the terms may be proven by parol. In the instant case, however, the contracts are complete in themselves, leaving nothing more to be said.

5. The plaintiff cannot import into them any additional stipulation inuring to her benefit on the pretense that she is merely inquiring into the consideration. The provisions of the agreements constituting the consideration are contractual in their nature, and not merely monetary. Within the meaning of *Sutherlin v. Bloomer,* 50 Or. 398 (93 Pac. 135):

"The consideration specified in the written contract consists of certain acts to be performed, and the authorities are practically unanimous in holding that, where the statement in the written instrument as to the consideration is of a contractual nature, as where the consideration consists of a specific and direct promise by one of the parties to perform certain acts, it cannot be changed or modified by parol or extrinsic evidence."

All the assignments of error upon which the plaintiff relies are bottomed upon an effort to go behind the written contract of dissolution and prove by oral testimony an agreement for the benefit of the plaintiff's decedent. They must all yield to the rule declared by Section 713, L. O. L., and cannot avail the plaintiff at this juncture. The judgment of the Circuit Court was right, and must be affirmed.

                                                        AFFIRMED.

MR. CHIEF JUSTICE MOORE and MR. JUSTICE HARRIS concur.

MR. JUSTICE BEAN dissents.

Denied May 16, 1916.

ON PETITION FOR REHEARING.

(157 Pac. 785.)

In Banc.   Statement by MR. JUSTICE HARRIS.

In response to an urgent petition for a rehearing
the entire record has again been examined. Morris
& Whitehead, Bankers, was a corporation which owned
and had control of several other corporations, includ-
ing the Oregon General Electric Company, which was
incorporated on December 6, 1901, with a capital stock
of $2,000,000 divided into 20,000 shares. W. T. Muir
and three others each subscribed for one share of the
stock of the Oregon General Electric Company, and
the balance of the stock was subscribed by Fred S.
Morris, who held the stock, however, as the property
of Morris & Whitehead, Bankers. On June 7, 1902,
the name of the Oregon General Electric Company
was changed to the Oregon Water Power & Railway
Company. On November 24, 1902, Julius Christen-
sen and the defendants James H. Morris and Fred S.
Morris formed a partnership under the name of Morris
Bros. & Christensen, and succeeded to all the assets
and business of Morris & Whitehead, Bankers. The
capital stock of the Oregon Water Power & Railway
Company was transferred from the corporation of
Morris & Whitehead, Bankers, to the partnership of
Morris Bros. & Christensen, the partnership agreement
making James H. Morris and Fred S. Morris each the
owner of two fifths and Julius Christensen the owner
of one fifth of the stock so transferred. In June,
1905, the partnership of Morris Bros. & Christensen
was dissolved, and about the same time James H.
Morris and Fred S. Morris formed a partnership

under the name of Morris Bros. When the firm of
Morris Bros. & Christensen was dissolved, all the
assets, including stock in the Oregon Water Power &
Railway Company, which were apportioned to James
H. Morris and Fred S. Morris, were taken over by the
partnership of Morris Bros. In April, 1906, Morris
Bros. sold all their stock in the Oregon Water Power
& Railway Company for $65 per share.

W. T. Muir, an attorney, who occupied a high posi-
tion in the profession, entered the service of Morris
& Whitehead, Bankers, on February 15, 1901, and his
employment was continued by his successors in in-
terest until April, 1906, when Morris Bros. sold all
their Oregon Water Power & Railway Company stock.
Mr. Muir received an agreed salary of $200 per month
until April, 1902; pursuant to an agreement made in
advance the amount was $275 per month from April,
1902, to December 31, 1902; during 1903 the agreed
salary was $400 per month; on January 1, 1904, the
salary was arbitrarily reduced by the employer to
$275 per month, and while Mr. Muir did not formally
agree to the reduction, he continued to receive $275
per month without objection during the remaining
period of his service.

The amended complaint alleges that W. T. Muir
"entered into the service and employment of the said
Morris & Whitehead, Bankers, for an agreed salary
as the attorney and counsel of said Morris & White-
head, Bankers," and it was agreed that he would act
as legal adviser for that corporation and for other
corporations then owned and controlled by Morris &
Whitehead, Bankers; that acting through its repre-
sentative Fred S. Morris, the employer, Morris &
Whitehead, Bankers, agreed with W. T. Muir that he
was inadequately compensated for the services he was

then performing, and that if he would continue in the service for such salary and devote his best energies to the success of the corporation, he would receive additional compensation for his services, and that such additional compensation would be ''an interest in the property, shares of stock, profits, and business of the said Oregon Water Power & Railway Company and of the said other corporations then owned, promoted, and operated by the said Morris & Whitehead, Bankers; that at said time the amount and extent of the interest of the property, shares of stock, profits, and business in the said Oregon Water Power & Railway Company, and said other corporations which the said William T. Muir under said agreement was to receive as additional compensation which was not then and there fixed or determined, but the amount of such interest in the property, shares of stock, profits and business of the said Oregon Water Power & Railway Company, and said other corporations, which the said William T. Muir was to receive, as aforesaid, was to be thereafter fixed and determined as soon as the business of the said Oregon Water Power & Railway Company, and the said other corporations, and the business of the said Morris & Whitehead, Bankers, should be made and become successful and profitable.''

It is then alleged that the partnership of Morris Bros. & Christensen assumed and agreed to pay all the liabilities of the corporation called Morris & Whitehead, Bankers, and that the partnership agreed that W. T. Muir was inadequately paid, and that if he would devote his best energies to the properties of his employers he would receive as additional compensation ''an interest in the property, shares of stock, profits and business'' of the corporations operated by Morris Bros. & Christensen, the extent of

such additional compensation to be determined afterward.

The plaintiff continues the narrative by averring that on or about November 7, 1904, in accordance with the agreements made with Morris & Whitehead, Bankers, and Morris Bros. & Christensen, relative to additional compensation, the partners in the firm of Morris Bros. & Christensen agreed among themselves that the amount, character and manner of payment of the additional compensation which W. T. Muir was to receive would be 1,000 shares of the capital stock of the Oregon Water Power & Railway Company, but that the stock was not issued to him. The pleading proceeds by alleging that when the partnership of Morris Bros. & Christensen was dissolved, and as a part of the dissolution agreement the dissolving partners agreed that the 1,000 shares of the Oregon Water Power & Railway Company stock which the partnership had in November, 1904, determined to issue to Muir would be and was his property, and that he was entitled to the stock as additional compensation; and that it was agreed between "Julius Christensen on the one hand, and the said James H. Morris and Fred S. Morris on the other hand," that James H. Morris and Fred S. Morris would deliver to W. T. Muir immediately after the dissolution of the agreement 1,000 shares of the capital stock of the Oregon Water Power & Railway Company, and "that in furtherance and in part performance of the said agreement of dissolution of the said partnership of Morris Bros. & Christensen made between the said members thereof as aforesaid, the said Julius Christensen, then and there assigned, turned over, and delivered unto the said James H. Morris and Fred S. Morris all of the capital stock of the said Oregon Water Power & Railway Company

then owned by the said Julius Christensen and all of his interest in the said Oregon Water Power & Railway Company.''

The complaint concludes by averring that Morris Bros. sold the capital stock of the Oregon Water Power & Railway Company, including the 1,000 shares which should have been delivered to W. T. Muir for $65 per share, on account of which it is alleged that the defendants are indebted to the plaintiff in the sum of $65,000. The defendants deny that they or any of their predecessors ever agreed to pay W. T. Muir additional compensation, and they likewise deny that they or any of their predecessors agreed to issue stock to W. T. Muir. This appeal results from a judgment of nonsuit. **AFFIRMED. REHEARING DENIED.**

For the petition there was a brief over the names of *Mr. Ralph E. Moody, Mr. Ben C. Dey, Mr. William D. Fenton* and *Mr. Kenneth L. Fenton,* with an oral argument by *Mr. Moody.*

*Contra,* there was a brief over the names of *Mr. John M. Gearin, Messrs. Teal, Minor & Winfree, Mr. W. A. Johnson* and *Mr. Charles W. Fulton,* with an oral argument by *Mr. Gearin.*

MR. JUSTICE HARRIS delivered the opinion of the court.

It appears from the statement already made that W. T. Muir was employed from February 15, 1901, until November 24, 1902, by Morris & Whitehead, Bankers, from November 24, 1902, until June 26, 1905, by Morris Bros. & Christensen, and from June 26, 1905, until the sale of the Oregon Water Power & Railway Company stock in April, 1906, by Morris

Bros.; from the time of the organization of the Oregon Water Power & Railway Company until April, 1906, the employer owned the controlling interest in that company, and was also interested in the promotion and operation of other corporations; and from the commencement to the end of his employment Mr. Muir regularly received a monthly salary, the amount of which was either expressly agreed upon in advance or was received without objection and without a demand for more.

All that part of the amended complaint which recites that Morris & Whitehead, Bankers, and its successor, Morris Bros. & Christensen, stated that W. T. Muir was receiving an inadequate salary, and that he would receive an additional compensation "to be thereafter fixed and determined" as soon as the business "should be and become successful and profitable," is only pleaded by way of inducement to the allegation that as a part of the dissolution agreement the partners in the firm of Morris Bros. & Christensen agreed that the 1,000 shares in the Oregon Water Power & Railway Company should be issued by Morris Bros. to W. T. Muir as payment of such additional compensation. When the evidence and pleadings are stripped to the final analysis, the question for solution is whether there is any legal evidence to support the claim that when James H. Morris and Fred S. Morris and Julius Christensen dissolved partnership they agreed among themselves that Morris Bros. would issue 1,000 shares of Oregon Water Power & Railway Company stock to W. T. Muir. The plaintiff is not seeking to recover the reasonable value of services rendered less the salary paid, but the executrix is attempting to recover the amount received for a definite number of shares of stock which it is alleged should

have been delivered to W. T. Muir as his property. If the partners did not agree that the 1,000 shares of stock should be issued to Muir, then the plaintiff could not recover, because this action is predicated upon an agreement to issue stock alleged to have been made between the partners when they dissolved the partnership. It therefore becomes necessary to ascertain what the dissolving partners agreed to do.

The defendants contend that the agreements of the partners are found in four writings, and that the inquiry must be limited to those writings; and the plaintiff argues that she is entitled to show by parol that the partners agreed that Morris Bros. would deliver to W. T. Muir 1,000 shares of Oregon Water Power & Railway Company stock. The four writings consist of a preliminary agreement looking toward a dissolution and dated January 31, 1905, an agreement made June 26, 1905, which provides for a transfer of stock in different corporations, a dissolution agreement entered into June 27, 1905, and finally a paper signed on November 2, 1905, which closes the partnership for all purposes. The first instrument stipulates that the partnership shall terminate on or before July 1, 1905, and that "the assets of the partnership shall be divided among the said three partners as their respective interests may appear"; and it also provides that the "indebtedness and liabilities of said partnership, as per list attached hereto, and as per list to be furnished as soon as possible by the Portland office and made a part of this agreement, shall be reduced and paid off as rapidly as possible. * * " By the terms of the second instrument James H. Morris and Fred S. Morris assume and agree to pay to Eugene Ivins $100,000, which the partnership had borrowed from him, and the Morrises transfer to Julius Chris-

tensen a specified number of shares of stock in three different corporations, in consideration of which Julius Christensen assigns to James H. Morris and Fred S. Morris certain shares of stock, including 2,096 shares of Oregon Water Power & Railway Company stock, and "all the right, title and interest of said Julius Christensen in and to" 5,000 shares of Oregon Water Power & Railway Company stock then in the hands of Eugene Ivins to secure the $100,000 loan; the Morrises are authorized to do every act that "may be necessary to fully vest the title of said shares of stock and all thereof in the said James H. Morris and the said Fred S. Morris, free and clear of all claims and demands." The first stipulation contained in the dissolution agreement dated June 27, 1905, reads thus:

"The said partnership shall terminate on July 1, 1905, and all of the assets of the partnership, as shown by the partnership books, shall be sold and disposed of by the liquidating partners as herein provided."

This instrument specifies and makes provisions for the payment of various items of partnership indebtedness, and then declares that:

"After all the liabilities of the said firm are paid and discharged, and upon the compliance herewith by the several parties hereto, the proceeds of securities or the securities themselves on hand shall be divided between the partners, in accordance with the said partnership agreement dated December 27, 1903."

The writing dated December 27, 1903, specifies the extent of the interest of the several partners, and makes each partner the owner of one third of all property acquired after July 1, 1903, while Christensen only owns a one fifth interest in all property acquired

prior to July 1, 1903. The dissolution agreement of June 27th concludes by asserting that:

"None of the funds or .assets of the partnership shall be in any way used by any of the liquidating partners, except as provided herein."

The final agreement made on November 2, 1905, opens with the statement that:

"It is desired at this time to finally close the partnership relations and make a final settlement and distribution of the assets of the said partnership and of its remaining outstanding obligations."

Christensen agrees to pay to the Morrises a certain sum of money, for which he is to receive certain notes, bonds and accounts which are itemized. The writing also discloses that:

"The said James H. Morris and Fred S. Morris further agree to pay all liabilities of the firm of Morris Bros. & Christensen, as evidenced by the books and records of said firm as of this date, as enumerated in the schedule hereto annexed, marked Exhibit C; the said James H. Morris and Fred S. Morris to receive in consideration of said payment and the other obligations assumed by them herein the assets of the said firm of Morris Bros. & Christensen, enumerated in the schedule hereto annexed marked Exhibit D."

6–9. These four instruments, made in 1905, were designed to cover all the assets and liabilities of the partnership of Morris Bros. & Christensen. The assets and liabilities of the partnership are all made definite and certain; there is an itemized list of the liabilities to be assumed by Christensen, and also a schedule of the debts to be paid by the Morrises, and yet no book or writing contains any reference to any claim of W. T. Muir for additional compensation, nor is there a single written word which even intimates that he is entitled to any stock. Neither the Morrises nor

Christensen owned any interest in any Oregon Water Power & Railway Company stock except as a member of the firm of Morris Bros. & Christensen, and therefore every share of stock which the Morrises and Christensen had an interest in was a partnership asset. As shown on its face the plain purpose of the paper dated June 26, 1905, among other things, was the transfer to the Morrises of the interest owned by Christensen in all the Oregon Water Power & Railway Company stock which the partnership possessed. The manifest object of the writing is confirmed by the following testimony of Christensen, who was not friendly to the Morrises:

"I executed or transferred all my stock that stood in my name at the time of our dissolution agreement in June, 1905."

And, finally, all doubt is removed by the amended complaint where the plaintiff expressly alleges:

That in part performance of the dissolution agreement "Julius Christensen, then and there assigned, turned over and delivered unto the said James H. Morris and Fred S. Morris all of the capital stock of the said Oregon Water Power & Railway Company then owned by the said Julius Christensen and all of his interest in the said Oregon Water Power & Railway Company."

The writing of June 26, 1905, the testimony of Christensen, and the pleading of the plaintiff all agree that Christensen transferred to James H. Morris and Fred S. Morris all his interest in all the Oregon Water Power & Railway Company stock owned by the partnership. The consideration for this transfer of stock as shown by the writing is of a contractual rather than of a monetary nature; and the general rule is that the recital of a contractual consideration excludes the

idea that any other agreements are to be performed or of there being any other consideration: *Sutherlin* v. *Bloomer,* 50 Or. 398 (93 Pac. 135). The writing of June 26th expressly states that the consideration for the stock transferred by Christensen is the assignment of certain other stock to him, and the agreement of the Morrises to pay the note held by Ivins, and applying the precedent established by *Oregon Mill Co.* v. *Kirkpatrick,* 66 Or. 21 (133 Pac. 69), the plaintiff cannot enlarge that consideration by showing that there was a parol agreement that the Morrises should do something more. Moreover, the four writings which relate to the dissolution of the partnership itemize the liabilities which Christensen is to assume, and enumerate in detail the debts which the Morrises are to pay, so that there is no room for any claim that parol testimony is needed to explain the writings because they explain themselves and specifically identify the debts to be paid by the Morrises. The plaintiff claims under the dissolution agreement, and therefore her right to recover, if any exists, must be referable to and measured by the dissolution agreement; the four writings, which evidence the agreement, itemize every liability assumed by the Morrises; the writing which transfers the Oregon Water Power & Railway Company stock states the exact consideration for the transfer; the writings do not indulge in generalities, but they speak with precision and give in detail the agreements to be performed and the acts to be done by the Morrises, and, as a consequence, these writings must be deemed to contain all the terms of the dissolution agreement concerning the Oregon Water Power & Railway Company stock; the dissolution agreement as found in the writings does not make any reference to the payment of additional compensa-

tion to W. T. Muir or the issuance of Oregon Water Power & Railway Company stock to him, and there-fore the plaintiff cannot by parol evidence impose upon the defendants an obligation not created by any of the writings.

The petition for rehearing is denied.

AFFIRMED. REHEARING DENIED.