### MUIR v. MORRIS et al.

(District Court, D. Oregon. April 21, 1919.)

No. 7413.

1. JUDGMENT ⬩828(1)—BAR BY PRIOR ACTION—NONSUIT.

Since a judgment of nonsuit in a law action does not bar a subsequent suit or action for the same cause in the state court, a judgment of nonsuit in the state court does not bar a subsequent suit in the federal court for practically the same cause.

2. CONTRACTS ⬩28(3)—EVIDENCE TO ESTABLISH PAROL CONTRACT—SUFFICIENCY.

Evidence *held* insufficient to establish a parol agreement by defendants, contingent upon the success of certain enterprises, to pay further compensation to complainant's testator for his services as their general counsel and confidential adviser, or a subsequent agreement under which they set aside and held in trust for him stock in a corporation as such further compensation.

In Equity. Suit by Jane W. Muir, executrix of the will of William T. Muir, deceased, against James H. Morris and Fred S. Morris, copartners as Morris Bros., and James H. Morris and Fred S. Morris. Decree for defendants.

Some time during the year 1901 Morris & Whitehead, Bankers, a corporation of Denver, Colo., doing business in Portland, Or., became interested in the promotion of a local corporation, known as the Portland City & Oregon Railway Company, and of the construction of a line of railway between Portland and Oregon City. The corporate name of this company was afterwards changed to the Oregon Water Power & Railway Company. James H. and Fred S. Morris and Julius Christensen were interested as stockholders in the Morris & Whitehead, Bankers, corporation. This company continued in business until about the 24th of November, 1902, when a copartnership was formed between James H. Morris, Fred S. Morris, and Julius Christensen, under the firm name of Morris Bros. & Christensen. The several interests of the parties in this copartnership and its properties were as follows: James H. Morris, 40 per cent.; Fred S. Morris, 40 per cent.; and Julius Christensen, 20 per cent.

This firm took over all the properties of Morris & Whitehead, Bankers, and assumed all its liabilities. The firm continued in operation until it was dissolved about July 1, 1905. The firm of Morris Bros., consisting of James H. and Fred S. Morris, was organized about this time, and took over,

---

⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

on dissolution of the firm of Morris Bros. & Christensen, part of its properties and assumed part of its indebtedness. All these corporations and firms were interested and had part in the promotion of the line of railway aforesaid in behalf of the Oregon Water Power & Railway Company. These concerns also engaged in the promotion of other corporations in this state and in Washington, and the enterprises for which they were organized, such as the Roseburg Water & Light Company, the Grants Pass New Water, Light & Power Company, and the Chehalis Water Company. They also engaged in the business of buying and selling stocks and bonds and other securities.

William T. Muir was employed by these concerns, namely, Morris & Whitehead, Bankers, Morris Bros. & Christensen, and Morris Bros., as their attorney and confidential adviser. Fred S. Morris was the manager in charge of Morris & Whitehead, Bankers, in Portland, when the employment was first agreed upon, and that employment was continued with about the same understanding with the succeeding firms, as they each came into existence.

Briefly stated, it is the theory of the bill of complaint, which is very lengthy, but skillfully drawn, that Muir was employed at a small, but inadequate, salary, with the understanding and agreement on the part of the employers that, as the several enterprises which these firms were engaged in promoting proved successful, he should become entitled to and receive an interest in the property, shares of stock, profits, and business of such concerns, and particularly in that of the Oregon Water Power & Railway Company, the particular interest in such property, profits, and business not being at the time of the employment expressly stated, specified, or agreed upon, but to be thereafter determined and fixed by the employers: that about November 7. 1904, or prior thereto, it was agreed by and between the members of the firm of Morris Bros. & Christensen, through an understanding that they then arrived at, that 1,000 shares of such stock should be issued to and become the property of Muir, but that the stock was not then issued; that some time prior to July 1, 1905, the said Morris Bros. & Christensen, acting at the time through the several members thereof, agreed upon such further compensation to be rendered Muir for his services as attorney for and confidential adviser of the said several corporations and firms, which was 1,000 shares of stock in the Oregon Water Power & Railway Company, to be and which was then set apart to James H. Morris and Fred S. Morris, to be held by them in trust for and for the use and benefit of Muir; that at the time this understanding was had and the agreement entered into by and between the members of the firm of Morris Bros. & Christensen, such members were contemplating and were then arranging for the final dissolution of the firm, a preliminary agreement looking to that end having been theretofore, to wit, on January 31, 1905, entered into, providing for the consummation of such dissolution on July 1, 1905, and that the consideration for the trust agreement moving to the parties was the division of the assets of the firm between the individual members thereof, and the assumption by the Morris Bros. of the payment of a portion of the indebtedness of the firm, and by Christensen of another portion of such indebtedness; that the agreement so entered into relative to the Morris Bros. holding the said 1,000 shares of stock in trust for the use and benefit of Muir was entered into and so consummated independently of and aside from any written agreement of the parties had or made looking to and in consummation of final dissolution of the firm, and the disposal and distribution of its assets, and was not a part of nor embraced in such written agreements, nor did it constitute any consideration upon which the same, or any of them, were based; that subsequently, to wit, on or about the 27th day of April, 1906, the firm of Morris Bros. sold and disposed of practically all the shares of stock of the Oregon Water Power & Railway Company, including the 1,000 shares which it held in trust for Muir, to the Portland Railway, Light & Power Company, for the sum of $65 per share, and have not since accounted to the said Muir, or the complainant herein, for the sum of $65,000 so received by it for said 1,000 shares of stock. Wherefore a decree is prayed requiring defendants to account to complainant for said sum of $65,000, and legal interest thereon from April 26, 1906, and for the costs and disbursements of the suit.

It should be explained in this connection that W. H. Hurlburt and George I. Brown, who were also in the employ of these concerns, respectively as manager and engineer, have been carried along in the bill of complaint as if they were also concerned in the litigation, but the suit is by the complainant individually, for a several recovery; the purpose being, no doubt, to set forth by way of inducement the exact relationship of the parties concerned, and to define more clearly and concisely the real interest and status of the complainant, as well as the supposed trust relationship and liability of Morris Bros.

The defendants, by their answer, put in issue the controlling inquiries sought by the bill, and set forth three further and separate defenses, namely: First, that the suit is barred by the statute of limitations and is stale; second, that complainant is estopped by the judgment of the state court rendered in a former action of Muir against Morris Bros. for money had and received to Muir's use and benefit, by which it was sought to recover the same money now sued for; and, third, that previous to the institution of this suit there was an account stated between the parties, Muir and defendants, touching all matters of pecuniary difference between them, and a complete and final settlement had and consummated.

William D. Fenton and James E. Fenton, both of Portland, Or., for plaintiff.

Teal, Minor & Winfree, Dolph, Mallory, Simon & Gearin, and William C. Bristol, all of Portland, Or., for defendants.

WOLVERTON, District Judge (after stating the facts as above). In the view I have taken of this case, it is unnecessary to take note of the several separate defenses, except the second, and of that only by way of inducement to the discussion that will follow in disposing of the main case.

In June, 1911, Muir instituted an action against Morris Bros. in the state court to recover from them the sum of $65,000, which it was alleged Morris Bros. had received on the sale of 1,000 shares of the capital stock of the Oregon Water Power & Railway Company, being the same stock here in controversy, to the use and benefit of Muir. The complaint in that case, although it was an action at law, presented practically the same issues as are presented here, and the testimony adduced by the plaintiff at the trial of that cause was in all material respects the same as that adduced by complainant here. On a motion for nonsuit, the cause was determined in the circuit court in favor of Morris Bros., and against Muir. Muir appealed to the Supreme Court, and the judgment of nonsuit was affirmed. Muir v. Morris, 80 Or. 378, 154 Pac. 117, 157 Pac. 785.

[1] While a judgment of nonsuit in a law action does not bar a subsequent suit or action for the same cause in the state court (Carroll v. Grande Bonde Electric Co., 49 Or. 477, 90 Pac. 903; Hanna v. Alluvial Farm Co., 79 Or. 557, 152 Pac. 103, 156 Pac. 265), and for that reason the judgment of nonsuit against Muir in that court does not bar the present suit for practically the same cause, the reasoning of the Supreme Court is of persuasive force and potency as applicable to the consideration of the cause here upon its merits. That case was disposed of upon the consideration that, where the terms of an agreement have been reduced to writing, the writing is to be deemed as containing all the terms agreed upon, and no evidence other than

the writing itself is competent for establishing the specific conditions. In other words, where parties have reduced their contract or agreement to writing, it is presumed to embrace all previous or concurrent understanding between them respecting the subject-matter of such contract or agreement.

The very crux of this case was presented to the Supreme Court, as it is here, namely, that the members of the firm of Morris Bros. & Christensen, on or prior to June 26, 1905, set aside to Muir 1,000 shares of the capital stock of the Oregon Water Power & Railway Company to be held for his use and benefit, and it was held in effect that the negotiations of the parties in that respect, whatever they were, were merged into and became a part of the written agreements for dissolution of the firm, and that Muir could not be permitted to establish otherwise the alleged agreement upon which he relied for recovery. However, by reason of the very strong contention of counsel that the alleged setting apart of the 1,000 shares of the Power Company stock to Morris Bros. for the use of Muir was an independent arrangement and agreement by and between the members of the firm of Morris Bros. & Christensen, and wholly aside from any of the agreements entered into looking to the dissolution of the firm, I am impelled to consider the case on that theory, but without deciding that the alleged independent agreement is not merged in the written agreements for dissolution.

[2] The questions presented are purely of fact, as it may be conceded that, if the testimony establishes what complainant contends for it, under her theory of the case, she is entitled to recover.

Proceeding on that theory, complainant's case hinges about two propositions, which are insisted upon by her counsel: First, whether in the year 1904, or about November 7th of that year, the Morris Bros., or either of them, agreed with Christensen, or otherwise, that the business of the several companies which Morris & Whitehead, Bankers, and Morris Bros. & Christensen, succeeding that corporation, were engaged in promoting, and especially the Oregon Water Power & Railway Company, had become successful, and that Muir should be paid 1,000 shares of the capital stock of the Power Company as additional compensation for his services rendered such companies; and, second, whether, immediately prior to June 26, 1905, at a conference held by James H. and Fred S. Morris and Christensen in the Philadelphia office of Morris Bros. & Christensen, there was, by mutual agreement between the parties, set apart 1,000 shares of the capital stock of the Power Company to the Morris Bros., or to one or either of them, to be by them held in trust and to be accounted for to Muir.

It is not essential to inquire in detail what the exact terms of the original contract with Muir were with reference to the payment of additional compensation for his services, as it is conceded that whether he was entitled to such additional compensation was dependent upon whether the business of the different enterprises which the companies were engaged in promoting became successful, and then upon the act of his employers in declaring it so, and in determining what the

additional compensation should be and how it should be paid. These were matters, under the alleged agreement, that were left entirely with the employers to determine and adjust.

The organization of the firm of Morris Bros. & Christensen apportioned the interests of the copartners therein, 40 per cent. each to the brothers and 20 per cent. to Christensen. The ownership of the concern comprised, among other property, "all shares of stock" owned by the firm in the Oregon Water Power & Railway Company. On January 31, 1905, the parties to the copartnership entered into what may be styled a preliminary agreement for dissolution, providing that the partnership should terminate on or before the 1st day of July, 1905. Later, on June 26 and 27, 1905, two other agreements were entered into by the members of the firm, designed to settle and distribute among the individual members the property that each should take and the liabilities each should assume and pay. On November 1, 1905, still another agreement was entered into, designed to accomplish the final adjustment of the dissolution and all copartnership affairs between the members of the firm. Reference will be had to the agreements as occasion requires.

Christensen, as a witness for complainant, relates that, in the spring or summer of 1904, Fred S. Morris, while in Philadelphia and at the company's office there, the witness and F. S. Morris being present, said that the firm (Morris Bros. & Christensen) did not own all the Power Company stock except such as had been given away by witness; "that Hurlburt and Muir and Brown were working for a small drawing account, and that he had given them stock in the Oregon Water Power & Railway Company, to the extent of 1,000 shares each, as their extra compensation." The stockbooks were referred to by counsel, which show that 1,000 shares each of such stock were issued, on November 7, 1904, to Hurlburt and Brown, but none on that date to Muir. On cross-examination witness says, touching the same subject, that Fred S. Morris told him "that we (meaning the firm) did not own all the stock; that he had given, or paid, or was about to pay, Hurlburt, Muir, and Brown 1,000 shares apiece, as their compensation; that they had been working for all these years in helping to develop that Oregon Company." That, according to witness, was his first knowledge of the amount of stock that they were to have.

Mr. Muir testified in the case in the state court, and his evidence is introduced here in behalf of complainant. He relates that during the entire time he was in the employ of Morris & Whitehead, Bankers, and Morris Bros. & Christensen, it was frequently stated by Fred S. Morris, who had charge of the business in Portland, that he (witness) was inadequately compensated, and with witness he coupled the names of Brown and Hurlburt, and that his purpose was to see that "we" (Muir, Hurlburt, and Brown) received additional compensation. The witness continues:

"There was never anything definite said to me, just how this compensation would be paid; there was no promise of any definite amount, or any particular thing, but there was a continual statement and promise that there was recognition of the fact that I and the other two men spoken of were very

much underpaid. * * * Putting it in the light that upon the failure, as I looked upon it, we would not be expected to be additionally compensated, but upon the issue of success we would be."

Muir disclaimed any knowledge of any agreement to the effect that he was to be paid 1,000 shares of the capital stock of the Power Company, and seems to have had no information touching any arrangements by and between the Morris Bros. and Christensen relative to his additional compensation until in April, 1908, when he, Hurlburt, and Keady went East with Fred S. Morris, to be present at a trial then pending between Morris Bros. and Christensen.

The only other testimony on the part of complainant that has any relevancy to any alleged agreement of the Morris brothers, or either of them, to pay to Muir 1,000 shares of stock in the Power Company as his additional compensation for services rendered, is that of Hurlburt, who relates that, while the persons above named were on their way East in 1908 to attend the litigation then pending between Morris Bros. and Christensen, and while at the depot at Nampa, Idaho, Fred S. Morris said to him that, when "they were able to dispose of the property, they would make settlement in full with the people who had aided them with the Oregon Water Power & Railway Company. That," witness continued, "included Mr. Muir and myself, Mr. Brown having been settled with."

Fred S. Morris testifies that his brother was present at the conversation alluded to by Christensen, and he denies that he told Christensen, at that or any time, that he had given or intended to give Muir, Hurlburt, or Brown stock in the Power Company to the extent of 1,000 shares each. James H. Morris recalls the conversation alluded to, and corroborates his brother Fred. James H. thinks the conversation took place some time in the summer or fall of 1904. The stockbooks show, as above stated, that 1,000 shares each of the stock were, on November 7, 1904, issued to Hurlburt and Brown, but none to Muir. If this incident proves anything in that relation, it is that there was some understanding on the part of Fred S. Morris, who issued the stock to Hurlburt and Brown, that the same should be so issued; but it negatives any purpose or intention on the part of Fred S. Morris to issue any stock to Muir, simply because of the fact that stock was issued to Hurlburt and Brown, and none was issued to Muir.

All that Christensen testifies to relative to this matter is in the way of admissions made by Fred S. Morris against his interest. He has no personal knowledge of the alleged substantive fact that any agreement was made by Morris to in any way further compensate Muir for his services. The Morrises not only disagree with him as to the admissions, but Fred S. Morris, who alone knew whether such an arrangement had been agreed to by him, testifies positively that there was no such agreement or understanding; and Muir, the party solely concerned and directly interested, had no personal knowledge on the subject whatever. It is impossible wholly to discredit Fred S. Morris, and believe Christensen instead, under the conditions obtaining, and such must be the result if the contention of complainant is to pre-

vail. I therefore conclude that complainant has not only failed to establish her first proposition by a preponderance of the evidence, but that the strong weight of the testimony is against her position.

We come now to the second proposition. Fred S. Morris went to Philadelphia in June, 1905, with a view to settling the partnership affairs of the firm of Morris Bros. & Christensen. Christensen had previously made a tentative draft of an agreement to be adopted for settlement, and had sent the same to Portland for the consideration of Fred S. Morris, but nothing was done in that direction until the latter went to Philadelphia. Mr. Muir went with him to assist in the settlement and in formulating the agreement when one was reached.

Shortly previous to June 26, 1905, conferences were held between the Morris Bros. and Christensen relative to the settlement of their partnership affairs. Christensen testifies that at one of these conferences a definite understanding was arrived at as it relates to the disposition to be made of the Power Company stock. The principal purpose attending the dissolution was so to divide the property in the main that Christensen would take the stocks and bonds of Eastern corporations held by the firm, and the Morris Bros. the stocks and bonds of the Western or Pacific States corporations. In other words, they were to swap stocks and the firm's holdings along these lines in their dissolution adjustment. Of the Eastern companies in which the firm was concerned, the Morris Bros. were to take over the Providence & Danielson Railway Company and the Jersey Central Traction Company, and were to take over all the Western corporations, among which was the Oregon Water Power & Railway Company, or rather the stock holdings thereof. The capital stock of the company consisted of 20,000 shares. Christensen relates that the stock of this concern owned by the firm was ascertained to be 15,478 shares; that, in ascertaining the amount of stock that had been previously disposed of, James H. Morris made a memorandum, on a pad of yellow foolscap paper, of the shares that had been disposed of by the Morris Bros., as Fred S. Morris gave the different items to him from memory, they not having the stockbooks present at the time; that witness enumerated certain items of stock owned outside of the partnership, and which he had disposed of, aggregating 1,503 shares, and that Fred S. Morris made mention of the following items which they had disposed of: J. Frank Watson, 1 share; A. B. Crosman, 1 share; W. H. Hurlburt, 1 share; W. T. Muir, 1 share (these were directors' shares; that is, shares issued to the parties merely for the purpose of qualifying them to act as directors); sold or given to some one in Portland, the name of whom the witness did not get, 15 shares; W. T. Muir, 1,000 shares; W. H. Hurlburt, 1,000 shares; George I. Brown, 1,000 shares—aggregating 3,019 shares, and, together with those disposed of by witness, making a total of 4,522, which, deducted from the 20,000 shares of capital stock, left 15,478 as then owned by the firm.

Witness then further states that his interest therein was found to be 3,095.6 shares, he being entitled to 20 per cent. of the firm property, and that the adjustment was accordingly made that there should be transferred by Christensen to the Morris Bros. 2,096 shares of the

capital stock of the Power Company, and that the Morris Bros. should assume and pay a firm indebtedness of $100,000 due Eugene Ivins, to whom 5,000 shares of such stock had been pledged as security with an option to purchase, and that upon payment of such indebtedness the Morris Bros. should be entitled to the ownership of the 5,000 shares so pledged to Ivins. Christensen's interest in this holding was 1,000 shares, which, added to the above, made up the 3,096 shares which Christensen claimed was his interest in the firm's holdings of the Power Company's stock. This disposition of this particular stock was carried into a written agreement, which was formulated and executed by the parties on June 26, 1905, whereby Christensen bargained, sold, assigned, and set over to James H. and Fred S. Morris the 2,096 shares and the further 1,000 shares held as collateral security by Ivins. By the same instrument James H. and Fred S. Morris were constituted by Christensen his attorneys in fact to assign said shares of stock to themselves. Christensen elsewhere draws the conclusion that there was by that transaction set aside the 3,000 shares to the Morris Bros. with which to further compensate these men—Muir, Hurlburt, and Brown—for their services. Christensen's testimony relative to the mention made by Fred S. Morris of stock so disposed of is somewhat discredited by testimony given in the case of Hurlburt v. Morris Bros., wherein he deposed that he was not certain whether Hurlburt's name was mentioned or not.

Both Fred S. and James H. Morris testify that the principal purpose of the conference alluded to by Christensen was to discuss and determine upon the division of the property of the firm between them; that it was generally agreed that there should be an exchange of properties, so that in the main Christensen would get the properties, stocks, and bonds of the Eastern concerns, and they those of the Western or Pacific Coast concerns; that there was no reason or occasion for determining to a nicety what the share of each partner was in the Power Company stock, as the whole of it then belonging to the firm was to go to them in any event, and they seem not to remember that any memorandum was made up of the stock previously disposed of, as Christensen contends. These men both say that Muir was present at all these conferences, and participated in the discussions relative to the distribution of the firm property and assets. Christensen denies this, and so does Muir. Muir did, however, draw up the agreements of June 26 and 27, 1905, which were designed to carry into effect the agreement of the parties arrived at during these conferences relative to the distribution of the firm property. Muir disavowed any knowledge of any discussion relative to the disposition of any stock to himself, Hurlburt, or Brown during those conferences, or that the Morris Bros. had agreed at any time to issue to him, or to Hurlburt or Brown, any stock until the time nearly three years later, namely, April, 1908, when he went East to assist in the litigation then pending between Morris Bros. and Christensen.

During the progress of that trial, occasion arose for consulting the stockbooks of the Power Company; it being supposed that they were in the possession of Clark & Co., who were instrumental in the pur-

chase of the stock from Morris Bros. Upon a call at the office, however, it was found that the books were not there. On the same evening a discussion arose, first at the office of Morris Bros. & Christensen, and then at the Art Club, where the parties repaired for dinner. There were present at these discussions, Muir, the two Morris brothers, and Hurlburt. Muir relates that Fred S. Morris wanted him to testify in the case then on trial that Fred S. Morris had theretofore issued to him, Hurlburt, and Brown 1,000 shares each of the Power Company stock, which Muir refused to do, saying it was not the fact, but that Morris insisted it was, and that Muir further insisted that the only stock that had been issued to him was 1,000 shares of the Ivins stock, in which Morris disagreed with him. Muir further testified that there was produced at that time a yellow piece of paper, upon which there appeared a memorandum in James H. Morris' handwriting, showing a disposition of stock very much as Christensen testified was made at the conference just prior to the 26th of June, 1905, except Muir said that it showed an issuance to Brown of 2,000 shares.

On Muir's return to Portland in May following, he made an extended memorandum of his recollection of what then transpired. In his testimony in his former case in the state court, he was unable to testify from his independent recollection of the incident touching the memorandum made on the yellow sheet of paper, or otherwise, except as his own memorandum informed him. The Morris Bros. positively deny that any such conversation took place, either at the office or at the Art Club, or that any yellow paper memorandum was produced such as Muir testified to. Mr. Hurlburt recalls the conversation, but not the incident respecting the yellow paper memorandum.

Shortly after the return from Philadelphia of Muir and Morris, Mr. Flegel interviewed Fred S. Morris, in behalf of Muir, touching the subject of the Morris Bros.' obligation to Muir, and Morris says, after he had discussed the matter fully with Flegel and asserted in the meanwhile that there was no such understanding as Muir claimed, that Mr. Flegel went away apparently satisfied, and that no subsequent mention was made by Muir respecting the matter until action was instituted by him in the state court against Morris Bros.

About December 15, 1905, Fred S. Morris interested himself in behalf of Muir and Hurlburt, and through an arrangement entered into between Morris and Muir and Hurlburt the latter two were enabled to redeem 1,000 shares each of the Ivins stock, with the understanding that they were to pay Morris $50 per share for the stock. Muir and Hurlburt gave their notes at the Merchants' National Bank, each for $25,000, indorsed by Morris, and on December 15, 1905, a certificate of stock for 1,000 shares was issued to each of them. They held this stock until the Power Company sold to Clark, when $65 per share was realized therefrom, and Morris Bros. paid over to Muir and Hurlburt the sum of $15,000 each, being their profit attending the redemption of the stock.

Now, coming to a discussion of this testimony, I am persuaded that a statement was made respecting the firm's holding of the Power Com-

pany's stock at the conference of the parties at the firm's office in Philadelphia, much as Christensen relates, for how otherwise was the amount of the firm's holdings arrived at? And it is quite probable that a memorandum was made showing what was supposed at the time by the parties concerned to have been the disposition of the stock other than the amount then found to belong to the Power Company. Fred S. Morris says that numerous memoranda were made, and perhaps on a yellow pad, during their conference, in order to arrive at a proper division of the properties, but he has no recollection of the specific memorandum alluded to by Christensen respecting the Muir, Hurlburt and Brown stock. There, was, however, really no occasion for ascertaining the exact number of shares of the Power Company stock then held by the firm, nor the amount of such stock that had been disposed of either by Christensen or the Morris Bros., for it was the understanding and agreement of the parties from the first that the Morris Bros. should have all the stock of the Power Company then held by the firm, whether it was much or little. That was a matter predetermined, but it was natural that the parties, for their own satisfaction, should have figured out and made an estimate of such holdings. The fact was that the stockbooks were in Portland, and the Morris brothers were speaking from their recollection when they set down the amount that they supposed they had disposed of. And in this they were mistaken, for they then had disposed of no stock whatever to Muir, except 1 share to qualify him to act as a director on the Power Company's board.

Nor had they really disposed of any of the shares that had been issued to qualify the holders to act as directors on the board. But for the purposes of their adjustment at the time it was wholly immaterial who was the owner of any stock of the Power Company outside of the holdings of the firm. It seems to have been supposed at that time that Christensen held no Power Company stock in his name, and that the whole of it, except what had been disposed of by the partners, stood in the name of Fred S. Morris. This was a mistaken assumption, for at that time there was standing on the stockbooks stock in the name of Christensen in the amount of 3,203 shares, and the contract of June 26th did not really provide for a transfer by Christensen to the Morris Bros. of the whole of his stockholding. But the intention of the parties was clear that he should transfer all his interest in the Power Company stock to the Morris Bros., and the fact that Christensen or the Morris Bros. had previously disposed of some of the Power Company stock was not a material factor in their deliberations at the time.

Although Christensen says that the stock was then set apart to the Morris Bros. for Muir, Hurlburt, and Brown, such was not the purpose of the negotiations. The sole and only purpose of the negotiations was to divide the firm's property among the members of the firm. The fact is that the parties not only did not set apart any stock at this time to the Morris Bros. for Muir, Hurlburt and Brown, but there was no consideration moving to Christensen for sustaining such a transaction. The Power Company stock was all to go to the Morris

Bros. in any event, no matter what the relations were between the Morris brothers, or either of them, and Muir, Hurlburt, and Brown. Christensen did not forego anything of value in view of, or in consideration of, the Morris Bros. taking to their account 1,000 shares each set apart to Muir, Hurlburt, and Brown, to be held for their use and benefit. The fact that the figuring was made as Christensen 'relates, whether on a yellow pad of paper or otherwise, is some evidence that the Morris brothers, or one of them, had at some time previously obligated themselves to deliver such stock to Muir, Hurlburt, and Brown, but it is not conclusive of such an obligation, and cannot be so treated. It was only an admission against interest at most; so that, if it appears otherwise that no such obligation ever existed, the evidentiary fact arising from the figuring must go for naught.

Furthermore, I have but little doubt in my own mind that Muir discussed the matter with the Morris Bros. in April, 1908, during the litigation between Morris Bros. and Christensen at Philadelphia, either at the firm's office or at the Art Club, very much as Muir relates, and the yellow paper memorandum was probably produced as he indicates; but, assuming all that to be true, it does not establish the fact insisted upon that the stock was set apart to the Morris Bros. at the June, 1905, conference, to be held by them for Muir, Hurlburt, and Brown. It may be some evidence of some previous obligation on the part of Morris Bros., as I have said in the discussion of the effect of the figuring had by the parties at the June, 1905, conference, to deliver to these parties each 1,000 shares of the Power Company stock, but it is very clear that the conversation with Muir in April, 1908, was not conclusive of that fact, nor does it imply a trust relationship between the Morris Bros. and Muir, Hurlburt, and Brown, or any of them.

There is a circumstance attending the negotiations in June, 1905, and which must be borne in mind as it respects the conversation that Muir had with the Morris Bros. in April, 1908, that is very significant, and is a controlling factor as it relates to the alleged obligations of the Morris Bros. to deliver to Muir the amount of stock it is claimed Muir was entitled to. Both the Morris brothers testify that Muir was present at the negotiations that took place in June, 1905. Muir says he was not, and so does Christensen. But whatever the fact is as to that, Muir was in intimate relation with all that went on there. He was the confidential adviser of the members of the firm, and especially of the Morris Bros., and drew the two contracts, those of June 26 and 27, 1905, which were the immediate outgrowth of the conferences had shortly previous thereto, and must have known at the time, and undoubtedly did know, all that took place thereat. If there was any such understanding or agreement as Christensen would seem to indicate, that any stock should be set aside to the Morris Bros. for him or for Hurlburt or Brown, he should have known of it. He says he did not know of it, and did not learn of it until the matters came up in the Philadelphia litigation, which was almost three years later. The simple reason for his not knowing of it is that the supposed fact did not exist. If it had, being an alert and capable lawyer, he would have been quick to take advantage of it and to turn

it to his account, especially after the entire Power Company stock was disposed of to Clark in 1906 at a large figure.

Muir says further that Fred S. Morris at the conversation wanted him to testify in the Philadelphia litigation that he (Morris) had theretofore issued to Muir 1,000 shares of the Power Company stock, or that that amount of stock stood in his name. Morris denies this, and so does his brother, James H. Morris. Hurlburt seems to corroborate Muir; but, whatever the fact may be as to such a conversation taking place, the fact is that never at any time did any Power Company stock stand in the name of Muir, except the 1 share of director stock and the 1,000 shares of the Ivins stock. It is true that there were issued to Hurlburt and Brown 1,000 shares each of stock on November 7, 1904, but none was then issued to Muir, nor at any other time, except the stock above mentioned. If there is any one thing of persuasive force to differentiate this case from the Hurlburt Case (Hurlburt v. Morris, 68 Or. 259, 135 Pac. 531), it is the fact that stock was actually issued to Hurlburt, while none was issued to Muir.

It is strange indeed that Muir, who was employed by Fred S. Morris and acting for the concerns with which he was connected, was his confidential adviser and on close and intimate relations with him, and was at the same time the secretary of the Power Company, and signed as such all the stock that was issued from time to time, never knew of any provision being made for his additional compensation until, as he says, he came into possession of the supposed fact during the pendency of the trial at Philadelphia. The relations between Fred S. Morris and Muir, so far as the evidence shows, were never strained in the least until they disagreed at Philadelphia in 1908, and it is most natural and reasonable to conclude that, if Fred S. Morris or his brother, or the firm of Morris Bros. & Christensen, had made or agreed to make any special provision for Muir as additional compensation, he would have been advised of the fact when the thing was done, and no doubt would have been. The circumstance that he was not is a potent factor tending to show that no such special provision was made for him.

For these reasons, I conclude that complainant has not established her second proposition. So far as the evidence shows, there was never a time when the Morris brothers, or either of them, or the firm of Morris Bros. & Christensen, agreed to compensate Muir futher by paying him 1,000 shares of the stock of the Power Company; nor is it an established fact that any stock was set aside by Morris Bros. & Christensen to the Morris brothers, or either of them, for Muir, or for his use and benefit, and complainant, therefore, is not entitled to recover in this suit.

It is my opinion, gathered from the evidence at this trial, that Fred S. Morris intended to compensate Muir further for his services; but the matter, even under complainant's construction of the employment, was left entirely within the discretion of his employers. I believe that this purpose on the part of Morris continued until the opportunity presented itself for him to assist Muir in the purchase of the 1,000 shares of the Ivins stock, and that, Muir having realized $15,000 out

of that transaction, Morris considered that he was adequately compensated for all services rendered, and dismissed the idea of rendering him further or additional compensation beyond that.

The bill of complaint will be dismissed.