## Hall et al. v. Hall et al.

(Decided Dec. 13, 1935.)

WAUGH & HOWERTON for appellants.

HOWARD & MAYO for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

The trial court, upon her petition, set aside two contracts made by Alice Hall, the widow of W. R. Hall, with his children and grandchildren, and because they were based on these contracts, set aside various steps that had been taken by them looking to a partition and distribution of his estate, and appointed a special commissioner to take proof to ascertain the extent of the estate, make report, settlement, etc. Two of his children and the children of a deceased child have appealed; the remaining son and the widow are our appellees. Her coappellee is the only son and the administrator of W. R. Hall. He is only nominally an appellee, and was made such because he did not consent to be made an appellant. His interests are with the appellants.

W. R. Hall died intestate, survived by his widow, Alice Hall, and by three children and the four children of a deceased child, as his heirs at law. The mother of these children and grandmother of the grandchildren was Susanna Hall, the first wife of W. R. Hall. She died in 1913, and on December 5th of that year W. R. Hall married Alice Burke, the plaintiff in the trial court and the principal appellee here.

She was then a maiden lady and long past maturity, when she entered this household to discharge the difficult task of stepmother; but how well she did so is attested by this record, for nowhere in its more than 500 pages do we find anything that is not in praise of her, which is in striking contrast to what is said of another stepmother in Guffy v. Gilliam, 213 Ky. 805, 281 S. W. 1024. Alice Hall was a passive, illiterate, industrious, and economical woman and devotedly obedient to her husband. She had accumulated some money and property before her marriage, to which she added thereafter, and which was wisely and profitably invested for her by her husband, so that when he died she had considerable estate of her own besides what was due her under our statutes from the estate of her husband. She had no children of her own but affectionately referred to these stepchildren as her children.

## The Cause of this Litigation.

In 1705 Virginia enacted a statute (See Va. Laws p. 29) by which a man without children was required

to will his wife one-half of his property, if he had one or two children he had to will her one-third, and if he had more than two children he could not leave her less than a "child's part," and if he did then, upon her petition, the court would declare the will null and void as to her. This became a part of our law. See Littell's Statutes, vol. 2, p. 575. This was soon supplanted by statutes enacted in this state; but it still lingers in the minds of our people, many of whom believe that a widow can, and some think she must, take "a child's part." Alice Hall thought so, she said W. R. Hall thought so, and the heirs were perfectly content that she should so opine.

### The Making of the Contract of May 16, 1932.

W R. Hall died on Friday, May 13, 1932, he was buried on the morning of Saturday the 14th, and as soon as the midday meal was over the heirs assembled in an adjoining room and called Alice Hall in and asked her what she wanted. For the heirs it is contended she called this meeting. She told them she wanted the old home and "a child's part," and it was then arranged they should meet in Prestonsburg on Monday morning, the 16th, qualify an administrator and fix up the matter.

They met as agreed, and Alice Hall and the heirs signed an agreement by which there was allotted to Alice Hall the old home and a few acres of surrounding land, the extent of same not appearing, and this she accepted in lieu of her claim of dower in all of W. R. Hall's land.

She agreed to convey to the heirs her interest (one-half) in a tract of land known as the Marion Hall tract, a like interest in the Bond tract, and agreed to convey her interest in any other land if such should be found in her name. In return for all this she was to get "a child's part," or one-fifth, of the personal property in full of her part of the personal property of W. R. Hall's estate.

### Making Deed of June 17th.

This had all gone through so easily that soon Alice Hall was in town again, and this time she made to the heirs a deed for the old home place that had been allotted to her in lieu of dower and surrendered to them all her claims on any other property of W. R. Hall,

either real or personal, thus parting with even the "child's part" that had been accorded her. For all this the heirs agreed to pay her $2,000, and that was easy to pay for all they had to do was to take $2,000 from the child's part she surrendered and hand it back to her so, the heirs had concluded another profitable day's work.

### The Forcible Detainer.

So confiding and ignorant of her rights was Alice Hall that she apparently did not know after making this deed that she would have to vacate the old home, so she stayed there. This so exasperated the heirs that they instituted a forcible detainer proceeding against her.

There, they made a fatal blunder, for that move brought her to town and into contact with her present attorneys, who so bestirred themselves that Alice Hall was soon in court attacking from front, flanks, and rear everything the heirs had done or induced her to do. The heirs resisted vigorously, and considerable proof was taken on both sides, but they were utterly routed.

Since the regular judge of this district was disqualified, the Hon. J. F. Stewart of Ashland was by the Chief Justice of this court appointed as special judge, and after a full hearing he rendered the judgment epitomized at the outset of this opinion.

### Was This Right?

"No!" say the appellants, and the gist of their argument is that these contracts were freely and voluntarily signed by Alice Hall after due deliberation and advice and that there is not such showing made as justifies their cancellation; while Alice Hall contends she executed them because she was "scared" and that she had no advice before doing so. There is no need of going into a detailed discussion of everything done that was calculated to terrorize this trustful old woman by these heirs whom she trusted and referred to as the children. It will be enough to say that Minda Hall testifies she saw a prowler on the premises and admits shooting about the place. The witness was perhaps honestly alarmed, but that same thing was calculated to alarm Alice Hall. There was evidence that when Alice Hall went to the barn to do the milking, Minda Hall accompanied her and said in the presence of Alice that

she would go along and watch; that she (Alice) might get her head shot off; that she was looking for it. Minda Hall in her testimony admitted this, but said she did not recall saying anything about Alice Hall getting her head shot off. Minda Hall testified she could not write, and at another place in the record she testifies she took a letter to a neighbor to get it read for her, so it seems she could not read; yet she testifies that on the night of May 15th Alice Hall gave her a slip of paper on which was written the combination of W. R. Hall's safe, and that by means thereof she (Minda) opened this safe, and that Alice took therefrom a leather bag containing about a pint of money. This Alice Hall denies. The administrator, Marion Hall, testifies there is about $$25,000 belonging to the estate he cannot find or account for. There is evidence Marion Hall claimed to have visited a medium in Huntington, and thereby communicated with the spirit of his father, and that he then came to this home and dug at places in the garden. Worn out as she was by her attentions to W. R. Hall in his last illness, stunned as she must have been by his death, and ignorant of her rights as this record shows her to be, Alice Hall must have been thoroughly terrorized by these and other eerie occurrences set out in this record, and we are sure she was, as she says, "scared" when she executed the instruments mentioned; but aside from that there was absolutely no consideration for the making of them and the action of the court in annulling them is approved.

The court did many other things in its judgment, but all of them are collateral to and dependent on the cancellation of these two contracts, so that a separate consideration of them is unnecessary.

Judgment affirmed.