Argued February 4; affirmed June 24, 1947; rehearing denied
September 9, 1947

BIERSDORF *v.* PUTNAM ET AL.
(182 P. (2d) 992)

*Paul R. Harris,* of Portland (with E. R. Trayle and Earl A. Fewless, of Portland, on the brief) for appellant.

*B. G. Skulason,* of Portland (with Henry Hartje, of Portland, on the brief) for respondents.

Before ROSSMAN, Chief Justice, and LUSK, BELT, BAILEY, HAY and WINSLOW, Justices.

BAILEY, J.

This suit was instituted by Phoebe Biersdorf against Lillian B. Putnam, Mable L. Biersdorf, Inez E. Rice, Edgar A. Biersdorf and Verna E. Luedtke, to have set aside an instrument, executed by the parties to this litigation on or about June 4, 1945, reading as follows:

"In consideration of the sum of One Dollar and other valuable consideration paid by Phoebe D. Biersdorf, widow of Herman R. Biersdorf, deceased, to children of said Herman R. Biersdorf, deceased, namely, Lillian B. Putnam, Edgar A. Biersdorf, Mabel L. Biersdorf and Verna E. Luedtke and Inez E. Rice, and in consideration of the sum of One Dollar and other valuable consideration, paid by all of the said children to the said Phoebe D. Biersdorf, the said Phoebe D. Biersdorf hereby assigns all of her right, title and interest in and to all of the personal property belonging to the estate of said Herman R. Biersdorf, deceased, to the said children, including all stocks, bonds, bank accounts and other evidences of indebtedness, defense bonds, etc., except the household furniture now located at 2716 S. E. 35th Avenue in the City of Portland, Oregon, and also the Ford automobile, the house and lot located at said address being held in the joint names of said Herman R. Biersdorf, deceased, and said Phoebe D. Biersdorf, is an estate by the entirety and under the law goes to the survivor, Phoebe D. Biersdorf.

"It is further agreed that the said children of said Herman R. Biersdorf, deceased, will pay the expense of administration of said deceased out of

their funds of said estate, including funeral expenses and expense of last illness.

"Dated June 4, 1945.

> Phoebe D. Biersdorf
> Lillian B. Putnam
> Mabel L. Biersdorf and Inez E. Rice
> by Lillian B. Putnam
> Edgar A. Biersdorf
> Verna E. Luedtke"

The complaint alleges that Herman R. Biersdorf died intestate on June 1, 1945, in Multnomah county, Oregon, leaving an estate consisting of personal property valued in excess of $30,000; that plaintiff and defendants, widow and children respectively of deceased, are his only heirs at law; that defendants, on or about the 4th day of June, 1945, by duress, menace, fraud and undue influence induced and caused the plaintiff to sign the instrument, copy of which is hereinbefore set forth, by advising the plaintiff that:

" * * * said decedent left a will which was effective as a will, and that the defendant Lillian Biersdorf Putnam was named therein as executrix to administer said estate; and that said defendant had prior right to act as such executrix. That said defendants further advised the plaintiff that if she insisted on receiving anything in addition to the home property, which was owned by the plaintiff and said decedent as tenants by the entirety, that said defendants would contest her right to any of said estate, and in such event plaintiff might not receive anything; defendants at said time and place further advised plaintiff that it was imperative that said offer be accepted on the spot, as the defendant Edgar A. Biersdorf had to leave the city the next day. That defendants advised plaintiff she might receive the automobile and household furniture if she signed the instrument, and further advised

plaintiff that she was not entitled to receive more than the home because of the brevity of the marriage. That all of said statements were made to plaintiff by the defendants and their legal adviser, who was present with them.''

It is further alleged that at the time such statements and representations were made.to her the plaintiff was greatly depressed, not mentally alert, ''was ignorant of her rights in said estate, and was inexperienced in such business matters''; that at the time she signed the instrument ''she was fearful that if she refused to accede to the demands of defendants and their counsel she would lose all her interest in said estate, including her home''; that she relied upon the representations which were made to her; that such representations were false and fraudulent and known by defendants to be such, and were made by the defendants for the purpose of deceiving and coercing her to execute the instrument; and that ''because of the false representations, threats, coercion and duress of the defendants, the plaintiff executed said instrument, and for no other reason''.

Defendants' amended answer admits that the plaintiff is the widow, and defendants the children, of Herman R. Biersdorf, deceased; that he died intestate June 1, 1945; that the value of his estate was in excess of $30,000; that the plaintiff and defendants are his sole heirs; and that plaintiff signed said instrument. It denies all the remaining allegations of the complaint.

After a trial on the merits the circuit court found for the defendants and entered a decree dismissing the suit. Plaintiff has appealed.

There is a decided conflict in much of the evidence relating to the circumstances surrounding the execu-

tion of the challenged instrument. Before discussing that evidence, however, we shall refer to matters about which there is little, if any, dispute.

Dr. Herman R. Biersdorf and plaintiff were married at Vancouver, Washington, on April 11, 1945. He was 71 years of age and had five children, defendants herein; she was 52 years of age and had four children, three of whom were then living. She is a graduate of a normal school and had taught school for five years. At the time of their marriage plaintiff was a nurse's assistant at the Veterans' Hospital and he was living with his daughter, Lillian Putnam, at Hillsboro, Oregon. He was in poor health and, among other ailments, he had a weak heart. About two years before the marriage he had a surgical operation on his skull which resulted in a partial paralysis of one side of his face. Dr. Biersdorf had known the plaintiff for about two years prior to his marriage to her and during that time she had been one of his patients. Before and after their marriage Dr. Biersdorf and plaintiff discussed the execution of a new will by him and the existence of a previously executed will by which he left all his estate to his children.

Dr. Biersdorf became acquainted with Henry Hartje, a member of the Oregon bar, about 1912. From that time until his death Mr. Hartje was his legal adviser and friend. Before their marriage plaintiff and Dr. Biersdorf had selected a residence which he had decided to purchase, and upon the advice of Mr. Hartje title thereto was taken in their joint names as tenants by the entirety a few hours after their marriage. For this property Dr. Biersdorf paid $5,500. In addition to furniture which he had, he paid $541 and Mrs. Biersdorf "430 some dollars worth" for new furniture for their home.

About eight days before his death Dr. Biersdorf had a heart attack. He passed away suddenly on June 1, 1945; funeral services were held at 11:30 o'clock in the morning on June 4. A few hours after his death Mrs. Putnam went to her step-mother's residence and the two of them selected the clothing that they thought would be appropriate for his burial and Mrs. Putnam took it to the mortuary. Mrs. Biersdorf consented to Mrs. Putnam's request that deceased be buried in the lot beside defendants' mother. Plaintiff testified that Mrs. Putnam asked her if the deceased's children could help her with the funeral arrangements and that she had given her consent on the condition that they would consult her "in every move that they undertook," but that they had gone ahead and made all the arrangements without consulting her at all. Mrs. Putnam testified that her step-mother "asked me to take care of it, as she hadn't known Dad very long, and she knew nothing of how to go about it or what minister to get, and so I arranged it."

█ We shall now consider the evidence relating to the execution of the instrument involved in this proceeding. There is a sharp conflict in most of this evidence and inasmuch as the plaintiff has the burden of proof we shall refer first to her testimony. She testified that shortly after two o'clock p.m., on the day of the funeral Edgar Biersdorf telephoned her at her home and "said that they were coming over to see me in the afternoon if that would be all right, and I said yes, I would be glad to have them come, and invited Edgar and his wife and son to stay over night", but that instead of Edgar and his wife and son coming over, he and his two sisters, Mrs. Putnam and Mrs. Luedtke, accompanied by their attorney, Mr. Hartje, arrived about five p.m.

Plaintiff stated that Mr. Hartje opened the conversation by saying: "We came over to talk to you about the Doctor's estate, as Edgar has to leave in the morning * * * I suppose you know the Doctor had a will and everything is willed to his children, but as you have been married such a short time you are not entitled to anything, but as the house is in your joint ownership I suppose that you will get that, but the rest all has to go through probate—he said, 'But all of it has to go through probate,' not 'the rest of it' ", and that he further said: "if I didn't sign the paper it would have to go through court and a big inheritance tax taken out, and that court costs were very high, that the children would have a hard time getting what they should have and some of us might possibly not get anything." We quote further from Mrs. Biersdorf's testimony as follows:

"Q. * * * Go on and tell everything that occurred there, all the conversation that took place.

"A. I knew that the Doctor had had a will, but he had told me that he was going to make a new will and he was going to make me the executrix and teach me how—or tell me how to carry through his will in case that he should die first, so that it would not have to go through court, and no expense and no inheritance tax taken out.

"Q. Just go ahead and tell the rest of the conversation.

"A. Mr. Hartje said nothing to that, and he continued, he said, 'You have a nice home here, and nice furniture,' and he began telling me what a nice place I had, but he said, 'You have been married such a short time that you are not entitled to anything.'

"Q. Who said that?

"A. Mr. Hartje. He said, 'I want to see the Doctor's children get what they are entitled to.'

"Q. Go ahead and tell all the conversation that took place.

"A. And then he said, 'I brought an instrument with me here. If you will sign this I can help you to get part of this furniture after the Probate Court costs are taken out.' He said, 'I suppose that you will get the house because that is in your joint ownership.' He looked in his briefcase and said, 'I find I haven't my papers with me; I will draw one up in longhand.'

"Q. He said he didn't bring the paper with him?

"A. Yes, sir.

"Q. What did he say? He said he would draw it up in longhand?

"A. Yes, he said, 'Which will be just as good,' and he sat at the table and wrote. I couldn't quite grasp all the first part, but he said anyhow that I was to get the furniture, after probate costs were taken out, so I asked him, 'How about putting the house in?' and he said, 'I don't think it will be necessary, but we can put that in too.' "

The only persons present during the discussion concerning the terms of the instrument were the plaintiff, defendants Lillian Putnam, Verna Luedtke and Edgar Biersdorf, and defendants' attorney Mr. Hartje. The plaintiff's daughter Ruth Sorenson was in her room upstairs and did not hear any of the conversation. Mrs. Biersdorf gave the following testimony regarding the drafting of the instrument:

"Q. Did he [Mr. Hartje] have any further talk with you as to what should be put in that paper before he wrote it?

"A. Well, he talked as he wrote it. As he was wording it he talked how to word it.

"Q. He did what, you say?

"A. As he was writing it he read out loud, as he was drawing up the instrument.

"Q. As he wrote it he read it so you could hear?

"A. Yes, sir.

"Q. Did you make any remarks about that when you heard what he was writing?

"A. Yes. First it seemed that he only put in the furniture, and I said, 'How about putting in the house in case I should lose it otherwise?' and he said, 'I don't believe it is necessary, but we might add that if you feel safer about it.' "

On cross-examination Mrs. Biersdorf's attention was directed to the provision in the instrument about the Ford automobile and was asked: "Did you understand by that that you were to get the car, the automobile?" She answered, "No, sir, he said that he would add that to it. I told Mr. Hartje that the Doctor had always called it his and mine; he said, 'That is our car,' so he said to Lillian, 'What do you think of that?' and she said, 'If it was Dad's wish that she should have it, it is my wish,' and he said to the others, 'What do you think?' and they said, 'All right.' "

Plaintiff testified that she "always thought a will was a will, regardless" of marriage; that she believed the statement made by Mr. Hartje "that there was a will in existence naming the children as beneficiaries"; and that she was influenced thereby in signing the instrument. She testified that the statement by Hartje that she might lose everything if she did not sign the instrument "gave me great fear". She said that she asked Mr. Hartje "if I could wait until morning and he said no, it was necessary to sign it then. * * * He said Edgar had to leave in the morning and it was necessary to get it right in so it wouldn't have to go through court." She further testified that she did not ask Mr. Hartje whether Dr. Biersdorf had made a new

will; that "we didn't talk about it", and that Mr. Hartje "never mentioned it."

After the instrument was signed, Mr. Hartje asked for Dr. Biersdorf's papers and documents and Mrs. Biersdorf, according to her testimony, went to the safe, got them and without looking through them delivered them to Mr. Hartje. She also told the defendants who were present that they could have some of the deceased's personal effects and before leaving that evening they packed some of them, expecting to call for them the next day.

Ruth Sorenson, plaintiff's sixteen-year old daughter, testified that her mother did not say anything about a will while they were in the cemetery, and that she did not believe that her mother had spoken to any of the defendants there. Mrs. Biersdorf, however, testified that Mrs. Putnam, while there, introduced her to Mr. Hartje.

Only three of the defendants, Lillian Putnam, Edgar Biersdorf and Verna Luedtke, personally participated in the negotiations leading up to the signing of the instrument here in question. At the time of the trial Mrs. Putnam was 47 years of age, living at Hillsboro, and had been bookkeeper and secretary for the City Dairy of Portland for 25 years; Edgar Biersdorf was 46 years of age, living at Veradale, which is 12 miles east of Spokane, Washington, and was a salesman for the Mutual Life Insurance Company of New York; and Verna Luedtke was 40 years of age, married and living at Beaverton, Oregon, and had taught at Russellville school, near Portland, for 20 years.

These three defendants all testified that Mrs. Biersdorf asked them, after the funeral and before they left the cemetery, to come over to her place some time

during the day, and that she also asked while at the cemetery if Dr. Biersdorf had made a new will and Mrs. Putnam answered that Mr. Hartje was taking care of that. These defendants and Mr. Hartje testified that they arrived at Mrs. Biersdorf's home some time between 7 and 8 o'clock in the evening on the day of the funeral and not at 5 o'clock as testified to by Mrs. Biersdorf and her daughter Ruth.

Mrs. Putnam was the first witness for the defendants. In addition to her testimony hereinbefore referred to, she testified that after their arrival at Mrs. Biersdorf's home they talked about the funeral services a few minutes and then Mr. Hartje brought up the question of the settlement of the estate, saying that Edgar had to go home the next evening, and that they discussed the understanding which Mrs. Biersdorf had with Dr. Biersdorf before and after their marriage. We quote from her testimony:

"Q. You may tell now as well as you can, as well as you remember, what was said by anybody there in the presence of the plaintiff, and by her.

"A. Mr. Hartje asked if she [Mrs. Biersdorf] were willing to live up to the agreement that she had made with my father before her marriage and after her marriage that she was to have the home and the furniture and the children were to have the stocks and bonds, and the same was to hold with her, that her children were to have any property that she had before her marriage.

"Q. What did she say to that?

"A. She said that was what she had agreed to and she was going to live up to it.

\* \* \*

"Q. Was anything said about an automobile?

"A. Yes, she said that my father said that she was to have the automobile, and we agreed to that.

"Q. After that conversation was something said about drawing up an agreement?

"A. Yes, Mr. Hartje said in order that we would all understand it that he would draw up an agreement, and he asked us all if that was all right, and we all agreed."

Mrs. Putnam said that Mr. Hartje told Mrs. Biersdorf that "there was a will before this marriage, which was now null and void"; that Mrs. Biersdorf admitted that she had asked Dr. Biersdorf not to make a new will and stated "that she had promised Dad that she would live up to what she had agreed both before and after her marriage"; and that Mr. Hartje did not tell Mrs. Biersdorf that unless she signed the agreement she might not get anything. On cross-examination Mrs. Putnam gave this testimony:

"Q. Now Mr. Hartje had some conversation with Mrs. Biersdorf about this agreement, this antenuptial agreement—is that correct—that they were supposed to have entered into about each letting their children have their property?

"A. Yes.

"Q. Did he tell her that that would have to be in writing to be valid?

"A. Yes, he did.

"Q. He told her that agreement was not valid that the property of each could go to their children?

"A. He told her it was an agreement made before marriage which was not valid, but he wanted to know if she was going to live up to the agreement that she made with my father.

"Q. He told her that it was not valid?

"A. Yes, he did.

"Q. What words did he use?

"A. He said that he knew Dr. Biersdorf had made an agreement with Mrs. Biersdorf before they were married that she was to have the house

and the furniture; the stocks and bonds and the bank account to be divided equally among the children.''

She further testified that as Mr. Hartje was drafting the instrument he ''explained it as he went along. Everything he wrote he explained to all of us and asked us if we understood'', and that after the instrument was signed Mrs. Biersdorf gave Mr. Hartje ''the papers out of the safe and she gave me the bank books.'' Mrs. Putnam stated that the papers were of no value, that ''they were old mining stock papers and investments that my father had made which had no value'', and that ''nothing was said about the amount of money in the bank'' but that Mrs. Biersdorf did say ''that one bank account was in the name of Mabel and Dad and one was in my name and Dad's.''

Edgar Biersdorf testified that after they were assembled at the plaintiff's home they referred briefly to the funeral services and then plaintiff asked Mr. Hartje ''if there was a new will'', to which he answered in the negative. There was then ''talk about an old will'' and ''that the settlement should be on the basis of the old will and of the way my father wanted it and the way she had agreed the settlement should be, both previous to and after the marriage.'' Then Hartje ''asked her if she had agreed to the terms of the old will, and she said yes, that was the way the Doctor wanted it and she would live up to her promise.'' He further testified that the house and furniture were mentioned and that Mr. Hartje stated that the house ''was in an estate in the entirety'' and that ''it was agreed that she should have the furniture'' and that ''we conceded the automobile right then'' to her. The automobile was a 1937 Ford. He further stated that

there were no threats of any kind made. We quote further from his testimony:

"Q. * * * At any time during the conference did Mrs. Biersdorf raise any objections to what was being done or said?

"A. No, she said that she understood that the old will of course was invalid but they had agreed on this settlement and she was willing to live up to her promise.

"Q. Did she say anything as to what she was entitled to in the absence of a will, what part of the estate?

"A. Yes, she made a statement that she understood she would be entitled to one-third, but at the same time she completed that statement by saying that she was willing to live up to the agreement."

Mrs. Luedtke testified that she thought she heard everything that was said during the time they were at Mrs. Biersdorf's home. She said that "Mrs. Biersdorf asked if there had been a new will made", and "Mr. Hartje said that there had not. Then Mr. Hartje wanted to know what Mrs. Biersdorf thought would be a fair division of the estate. Mrs. Biersdorf said that she wanted the house, and Mr. Hartje said that the house was hers because of the deed by the entirety. Then Mrs. Biersdorf said she thought she should have the furniture, and she wanted the car. There was a little discussion about the car, but it was finally agreed that she should have it." She stated that she did not hear Mr. Hartje threaten the plaintiff in any way, and that she did not hear him say that "if she didn't settle she wouldn't get anything." We quote further from her testimony:

"Q. Did you hear any conversation between her and Mr. Hartje about any agreement with your father?

"A. Yes.

"Q. What did you hear?

"A. Mr. Hartje said that my father had told him that they had an agreement that she was to have the house and the furniture, and the rest of the property was to be divided among the children.

\* \* \*

"Q. Did you hear her say anything in response to that statement by Mr. Hartje?

"A. Yes, she agreed that that was right.

"Q. And was there anything said by either of them as to whether or not she was willing to settle the estate on that basis?

"A. Yes.

"Q. What was said?

"A. She said that was right, that the children were to have that, and that she was willing that they should."

On cross-examination she gave the following testimony:

"Q. Did you have any discussion there that evening at Mrs. Biersdorf's house regarding a revocation of the old will or whether it was still effective?

"A. She asked if the old will was good and Mr. Hartje told her no.

"Q. As I understood your testimony, you said that she asked Mr. Hartje what would have been her share if there had been no will—that is right, isn't it?—and she said she understood that she would get a third. Was that it?

"A. No, she said, 'I could claim a third of his estate if I wanted to, but I would not feel right to do so.'

"Q. And did Mr. Hartje at that time tell her that she was entitled to a half?

"A. No.

"Q. He didn't say anything about that?

"A. No."

Mr. Hartje testified that he had been a member of the bar since 1907 and had practiced his profession in Portland since 1910. He met Dr. Biersdorf in 1912 and had acted as his legal adviser until his death. Dr. Biersdorf had asked him before his marriage to the plaintiff if it would be necessary for him to make a new will and he advised him that it would be. About three days after he was married, the doctor told Hartje that he was going to bring the old will in and have a new one made. About a week or ten days thereafter Hartje again saw the doctor and the latter advised Hartje that it would not be necessary to make a new will, that Mrs. Biersdorf "had told him not to make the new will, that she would live up to the old will, their agreement, that is, she would give them everything that they had agreed on". After the funeral some of the defendants called at his office and advised him that Mrs. Biersdorf "had invited them to come out to the house that night." Hartje, according to his testimony, told them that he wanted to go along "because of this promise that had been made and to see whether she would admit that she had told Dr. Biersdorf after they were married not to make the will * * *."

The conference at Mrs. Biersdorf's home was explained by Hartje as follows: "I spoke to her about Dr. Biersdorf's affairs and the estate; I started to talk to her about it, and the first question she asked me was, 'Did Dr. Biersdorf make the new will?' and I said, 'No.' I said, 'I understood you told him not to make the will, that you would give the children what you and he had agreed on before the marriage,' and she admitted that, that she had done that, and she said she never did expect to get anything out of the stocks and bonds, that it wouldn't be fair to the children. * * * Then

she said that she could claim a third of the estate since the will hadn't been made. She mentioned that Dr. Biersdorf had promised her the automobile, and she said, not now, but after four or five months that he was going to give her some money. I told her that the Doctor hadn't said anything about the automobile *to me or anything about the money*; he had told me that she was to receive the house and the furniture, she was to have the furniture that he had owned before and they were going to add some new pieces of furniture, and she said—let's see, Lillian—Mrs. Putnam I think spoke up at that time about the automobile and she said that they would let her have the automobile. She seemed to be satisfied with that arrangement, that is, to have the house, the furniture and the automobile, and she didn't any further insist on the money.'' Hartje was asked if he told Mrs. Biersdorf ''that if she didn't reach an agreement with the children she would lose the entire estate'', to which he answered: ''No, there wasn't anything said about that. She was willing that this should be done and there wouldn't have been any occasion for a remark of that kind.'' He didn't tell her that he ''would look after her interests in this matter'', nor did he threaten her in any way.

Mr. Hartje testified that Mrs. Biersdorf telephoned him about ten o'clock the next morning and stated that she ''had thought it over and she had phoned her attorney, and her attorney told her she shouldn't have done it.'' Mrs. Biersdorf testified that she did not call Mr. Hartje but that he had telephoned her after she had telephoned to her attorney, nor did she tell Mr. Hartje that she ''had decided not to stand by the agreement'', but ''told him I had turned it over to my lawyer, for him to call my lawyer.''

540

■ It is a rule of this court in equity cases to give weight to the findings of the trial court on disputed questions of fact. That court sees and hears the witnesses and therefore is in a better position than we are to evaluate the testimony. However, such findings are not binding on us. Where the evidence is conflicting, it is our duty to carefully examine the record for the purpose of determining the truth. In the instant suit the trial court did not make special findings of fact. The decree contains a general finding to the effect "that the plaintiff has failed to sustain the allegations of her complaint", and based thereon a decree was entered dismissing the suit.

■ It is very evident that the circuit court in deciding against the plaintiff must have adopted the defendants' version of the negotiations leading up to and culminating in the execution of the challenged assignment. We concur in the circuit court's finding that the plaintiff failed to sustain the allegations of her complaint and are of the opinion that the happenings at Mrs. Biersdorf's home on June 4, 1945, at the time the asssignment was executed, were substantially as related by the defendants Lillian Putnam, Edgar Biersdorf and Verna Luedtke, and their attorney Mr. Hartje.

Mrs. Biersdorf admitted that she and the deceased had discussed before and after their marriage the execution by him of a new will; that he had said, "There is enough for all, for you and the children too"; and that "I will have to leave some for my children; it wouldn't be right not to." Dr. Biersdorf, she stated, was going to "tell me how to carry out the will so that no inheritance tax could be taken out and that things could be automatically turned over to whom it was supposed to go without going through court".

According to the evidence on behalf of the defendants, Dr. Biersdorf intended to make a new will leaving his property, with the exception of the house and furniture therein, to his children; Mrs. Biersdorf knew about his intention and persuaded him not to make a new will and promised that she would see that his wishes were carried out; she admitted the foregoing facts at their conference on June 4 and stated that she was willing and ready to carry out the understanding which she had with her deceased husband; and the attacked instrument embodied substantially the agreement between Mrs. Biersdorf and her deceased husband.

It is argued that Mrs. Biersdorf was depressed and not mentally alert at the time she signed the instrument here involved and therefore did not know what she was doing. We assume that she was depressed. But we think that the defendants also were saddened by the loss of their father because he undoubtedly meant much to them. Mrs. Biersdorf, however, was eager to ascertain if the deceased had made a new will and to arrive at an understanding with the deceased's children as to what she was to receive.

One thing in particular impresses us about the plaintiff's testimony. Not once during the time she was on the witness stand did she claim ignorance or forgetfulness of what was said or what occurred at her home that was material to the issues. It is difficult to understand how one, whose mind was in the condition which Mrs. Biersdorf repeatedly asserted that hers was during the negotiations leading up to the signing of the instrument, could apparently remember the details as clearly as is portrayed by her testimony.

Counsel for plaintiff censures defendants, and especially their attorney Mr. Hartje, for not telling

Mrs. Biersdorf that she was entitled to all the personal property exempt from execution; to a widow's allowance; to act as administratrix of the estate; and to one-half of the personal property. There is no evidence that Mrs. Biersdorf did not know what she was entitled to as the widow of deceased except a statement, which some of the witnesses attributed to her but which she denied, to the effect that she would be entitled to one-third of the personal property if she cared to insist upon it. The entire discussion which occurred at Mrs. Biersdorf's home, according to the testimony on behalf of the defendants, centered around the question whether or not Mrs. Biersdorf was going to carry out the promise which she had made to her deceased husband, not how much or how little she was entitled to as the widow of the deceased.

Plaintiff contends that she "waived, by virtue of the alleged contract, the following valuable rights: 1. The right to a widow's allowance for support for a period of at least one year; 2. The right to have personal property (furniture) set aside as exempt; 3. The right to be appointed administratrix of the estate with the consequent emolument of office (approximately $1000.00)."

■■ In our opinion, Mrs. Biersdorf did not waive her right to a widow's allowance (§ 19-603, O. C. L. A.) for the two following reasons: (1) She did not waive the right by assigning her interest in some of the property to the defendants; (2) the widow's allowance is an expense of administration. *In re Shepherd's Estate*, 152 Or. 15, 37, 41 P. (2d) 444, 49 P. (2d) 448. Under the stipulations in the assignment, the defendants agreed to pay "the expense of administration of said deceased out of their funds of said estate".

Section 19-602, O. C. L. A., provides for setting apart for the widow all the property of the estate exempt from execution, and by § 6-1201 (5), "household goods, furniture and utensils to the value of three hundred dollars" are exempt from execution. The evidence is undisputed that Dr. Biersdorf at the time of his marriage to plaintiff purchased new furniture of the value of $541 and that other furniture which he owned, the value of which is not shown by the record, was moved to their new home. Plaintiff unquestionably was not entitled to have all the furniture belonging to the estate set aside to her as exempt from execution.

The tools, implements, apparatus, motor vehicle, or library necessary to enable any person "to carry on the trade, occupation or profession by which such person habitually earns his living" are by § 6-1201 (3), O. C. L. A., exempt from execution to the value of $400. It is stated in plaintiff's brief that decedent's automobile was inventoried at $638, its O. P. A. ceiling price. The record does not disclose whether this automobile was necessary to enable this 71-year old doctor to carry on his profession, nor is there anything in the record to show the value of his surgical tools, apparatus and medical library.

Section 19-210 provides that "Administration shall be granted and letters thereof issued as follows: (1) To the widow, widower or next of kin in the discretion of the court * * *." Plaintiff as the widow of the deceased had no preferential right to be appointed administratrix of the estate. We, however, see nothing in the assailed instrument which would have prevented Mrs. Biersdorf from applying to the court to be appointed administratrix. Moreover, the administratrix's fee, as observed by the trial court, "is based

on services rendered, and if she were to act she would have to furnish the services.''

Plaintiff's first proposition of law is that there was no consideration received by or promised to Mrs. Biersdorf for signing the instrument here under discussion and hence such instrument ''is *nudum pactum* and, therefore, unenforceable.'' In support of this proposition plaintiff cites *Hall v. Hall*, 261 Ky. 685, 88 S. W. (2d) 690, and *Hall's Adm. v. Hall*, 285 Ky. 730, 149 S. W. (2d) 24. *Hall v. Hall* was a suit to set aside two contracts made by the widow of W. R. Hall, deceased, with his children and grandchildren, whereby she agreed to transfer her interest in certain tracts of land in consideration of the agreement of the heirs to pay her $2,000, which, the court said, ''was easy to pay for all they had to do was to take $2,000 from the child's part she surrendered and hand it back to her''. The court held that ''there was absolutely no consideration for the making of'' the contracts by the widow and also that she ''must have been thoroughly terrorized by these and other eerie occurrences set out in this record, and we are sure she was, as she says, 'scared' when she executed the instruments mentioned''. *Hall's Adm. v. Hall*, supra, presents another feature of the litigation growing out of the transactions involved in *Hall v. Hall* but has no bearing upon the matters now being discussed.

■ The instrument sought to be set aside by Mrs. Biersdorf was fully executed on her part before the institution of this suit. The only unperformed part is that of the defendants. From 17 C. J. S., Contracts, 422, we quote: ''If one makes an executory contract which lacks consideration, he may avoid it when called on for performance, but if he executes the contract by performance he cannot undo his voluntary act.''

*Peavy v. Wells,* 136 Minn. 180, 161 N. W. 508, was a suit brought by Mrs. Peavey, the administratrix of her deceased husband's estate, to set aside a transfer of stock made by Mr. Peavey on the ground that there was no consideration for the transfer by him to the defendants. The instrument purporting to transfer the shares of stock recites that the transfer was made "for and in consideration of $1, and other good and valuable considerations to me in hand paid". At the same time that this instrument was signed defendants "made the following agreement, called a note, relative to payment", in which it was provided that the purchase price of the stock, to wit, $700,000, and interest thereon at 4 per cent per annum were "not required to be paid otherwise than from the proceeds of dividends declared and paid" upon the shares of stock so transferred.

The trial court held that there was no consideration for the transfer inasmuch as the purchase price thereof was to be paid from the dividends on the stock and not otherwise. The case in the appellate court "was largely argued upon the assumption that the promise · of the defendants was not a consideration for the transfer, that is, that the transfer was without consideration" and the court proceeded upon that assumption. We now quote from the opinion:

> "At the outset we note that the case is not one of mutual promises—a promise in return for a promise. The contract is not bilateral. The only unperformed promise is that of Wells and Heffelfinger. They are not in default. Peavy did at once all he was to do. He did not merely promise to transfer the stock—he transferred it. The question is not whether if Peavey had agreed to transfer his stock in return for the promise of the defendants

to apply dividends until par and interest were paid a court would enforce specific performance or award damages for a breach.''

The court, after referring to numerous authorities holding ''that the rule requiring a consideration has no application to executed contracts'', said:

''An executed gift cannot be recalled at the donor's will. It may be rescinded for fraud. If Peavey had transferred the stock to the defendants in the form he did, without an agreement for payment, intending an unconditional gift, he could not have recalled it. He did not make a gift. He transferred title just as he would have transferred had he intended a gift and made one. The difference is that instead of transferring for nothing he chose to exact something in return with the sufficiency of which he was satisfied. He may have been wise or he may have been unwise. We are not concerned to know. In the absence of fraud his act is final.

''We follow the doctrine derived from Dean v. Nelson and other cases supra, and hold that the plaintiff cannot avoid the transfer of the stock for want of consideration alone.''

The court made it plain that the question whether there was a consideration for the transfer of the stock was not foreclosed by its decision. In this connection we note that in *Parsons v. Lipe,* 15 Misc. 32, 286 N. Y. S. 60, 83, it is pointed out that it is not an uncommon practice to provide for payment of the purchase price of capital stock through dividends and that such contracts have been generally upheld, citing numerous authorities.

The following cases support the doctrine laid down in *Peavey v. Wells: In re Alms' Estate,* 153 Minn. 256, 190 N. W. 253; *Society of Missionary Catechists, etc., v.*

*Bradley,* 112 Ind. App. 556, 44 N. E. (2d) 209; *Winningham v. Dyo,* (Tex. App.) 48 S. W. (2d) 600. We quote from *In re Alms' Estate*:

" * * * To paraphrase the language of Justice Dibell in the Peavey case: The father had the right to transfer this money for any consideration, valuable or otherwise, which he saw fit to accept, or for no consideration at all. If he had transferred it to the child without exacting anything in return, it would have been a valid gift. Instead of making an outright gift, he chose to exact from the child a promise to make certain payments thereafter. As the undertakings on the part of the child were satisfactory to him and all that he exacted, their sufficiency as a consideration for the transfer is not open to question."

In 6 C. J. S., Assignments, 1048, § 2 (3), it is said that a "gift is analogous to an assignment. In fact it is an assignment perfected by delivery, and the difference between the two rests solely in the method of proof, and in all other particulars an assignment without valuable consideration and a gift are alike." It is "well established at law that to constitute a valid gift a transfer must be voluntary, absolute, and without consideration." 24 Am. Jur., Gifts, 731, § 2.

Were we to concur with plaintiff that there was no consideration for the assignment, it would not necessarily follow, as argued by her, that the attacked instrument is void or even voidable and should be set aside and annulled by the court. Based upon the facts here involved and the law relative to gifts and executed contracts, to which we have referred, we should still be confronted with the question whether lack of consideration alone would be available to plaintiff in her attempt to have the instrument cancelled. We, however,

do not pursue further the question whether this assignment amounts to a gift of the property therein mentioned because in our opinion there was a substantial consideration for its execution.

The assignment recites that in "consideration of the sum of One Dollar and other valuable consideration paid by" Mrs. Biersdorf to the children of Herman R. Biersdorf, deceased, "and in consideration of the sum of One Dollar and other valuable consideration, paid by all of the said children to" Mrs. Biersdorf, certain property rights of Mrs. Biersdorf were assigned to the children. The instrument also contains an agreement on behalf of the children to pay out of their funds expenses of administration, funeral expenses and expenses of last illness.

It is argued by plaintiff that the recital of the payment of one dollar by each of the contracting party or parties to the other is not any consideration whatsoever. This contention finds support in 1 Williston on Contracts, Revised Edition, 393, § 115, where it is said that "a bargain stated to be 'in consideration of one dollar by each to the other paid' does not support a contract even though it be assumed that the sum of one dollar was actually paid by each party to the other." To the same effect see *Velie Motor Car Co. v. Kopmeier Motor Car Co.*, 194 F. 324, 331; *Robertson v. Garvan*, 270 F. 643.

■ We are therefore confronted with the proposition whether parol evidence is admissible to explain the phrase "one dollar and other valuable consideration" appearing in the assignment, or to show what constituted the "other valuable consideration". It is the general rule that where the consideration for a written contract is mentioned therein merely by way of recital

and is not a contractual term of the contract, the true consideration may be shown by either party, although it is different from that expressed. This is a well-recognized exception to the parol evidence rule. Some of the authorities refer to such recital as being in the nature of a receipt. *Marks v. Twohy Bros. Co.*, 98 Or. 514, 528, 194 P. 675; 32 C. J. S., Evidence, 885, § 953; 20 Am. Jur., Evidence, 973 et seq., §§ 1111, 1112, 9 Wigmore on Evidence, 3rd Ed., 108, § 2433; 4 Jones, Com. on Evidence, 2nd Ed., 2853 et seq., §§ 1561 and 1562.

██ Where the consideration is shown by the writing to be of a contractual rather than of a monetary nature, parol evidence is not admissible to show that other covenants or agreements are to be performed. *Muir v. Morris,* 80 Or. 378, 392, 402, 154 P. 117, 157 P. 785; *Coker & Bellamy v. Richey,* 104 Or. 14, 202 P. 551, 204 P. 945, 204 P. 947. The instrument signed by plaintiff and defendants contained the recital of a consideration of a monetary nature, in addition to that of a contractual one. Some of the consideration received by Mrs. Biersdorf for executing the instrument here involved was the receipt by her of defendants' interest in the furniture and the automobile belonging to Dr. Biersdorf's estate. The assignment itself does not so specifically provide but that that was the understanding of the parties is clearly shown by the evidence. Admission of such evidence would be merely explanatory of the recital of the monetary consideration and would not vary or contradict any contractual term or other provision of the instrument.

██ Plaintiff contends that if she received any consideration for executing the assignment, it "was so grossly inadequate as to shock a conscientious person,

and that such inadequacy alone furnishes ground for annulling the document.'' Referring to the question of the adequacy of the consideration, it is stated in 1 Williston on Contracts, Revised Edition, 385, § 115, that it is an '' 'elementary principle that the law will not enter into an inquiry as to the adequacy of the consideration.' This rule is almost as old as the law of consideration itself. Therefore anything which fulfills the requirements of consideration will support a promise whatever may be the comparative value of the consideration, and of the thing promised. Thus * * * surrendering a document though it has no value is sufficient consideration for a promise to pay a large price. The surrender of a piece of paper on which a void guaranty had been written was sufficient consideration for a promise to pay ten thousand pounds.'' There is no merit in this contention.

The court will place itself in the position of the contracting parties to enable it to arrive at their intention and to properly construe the language used. § 2-218, O. C. L. A.; *Pinnacle Packing Co. v. Herbert,* 157 Or. 96, 70 P. (2d) 31, 111 A. L. R. 1055. The circumstances under which the assignment was executed ''including the situation of the subject of the instrument and of the parties to it'' are shown by the evidence. It is very apparent from the entire record that the underlying motive actuating Mrs. Biersdorf's execution of the assignment was her resolve to carry out the promise which she had made to her late husband.

Mrs. Putnam's authority to sign the assailed instrument on behalf of Mabel L. Biersdorf and Inez E. Rice has not been questioned in the circuit court nor in this court by any of the interested parties. Plaintiff has assumed from the beginning that this authority existed.

She alleges in her complaint that defendants,—and that includes Mabel L. Biersdorf and Inez E. Rice who were not present during the negotiations—induced her to sign the instrument, thereby implying at least that these two absent defendants were represented by Mrs. Putnam. When it was sought to identify the instrument counsel for plaintiff stated: "Your honor, the execution of the document is admitted." And in answer to the question, "You saw Lillian B. Putnam sign it, did you?" plaintiff said, "Yes, she signed for herself and her sister [sisters]." Moreover, it was admitted in evidence without objection.

In our opinion no error was committed by the circuit court. The decree appealed from is therefore affirmed. Neither party will recover costs in this court.

WINSLOW, J. (Pro Tempore)

I dissent.

This suit was commenced by appellant against respondents for the purpose of cancelling an agreement entered into between the parties, dated June 4, 1945. A copy of the agreement is as follows:

"In consideration of the sum of One Dollar and other valuable consideration paid by Phoebe D. Biersdorf, widow of Herman R. Biersdorf, deceased, to children of said Herman R. Biersdorf, deceased, namely, Lillian D. Putnam, Edgar R. Biersdorf, Mabel L. Biersdorf and Verna E. Ludtke and Inez E. Rice, and in consideration of the sum of One Dollar and other valuable consideration, paid by all of the said children to the said Phoebe D. Biersdorf, the said Phoebe D. Biersdorf hereby assigns all of her right, title and interest in and to all of the personal property belonging to the estate of said Herman R. Biersdorf, deceased, to the said children, including all stocks, bonds, bank accounts and other

evidences of indebtedness, defense bonds, etc., except the household furniture now located at 2716 S. E. 35th Avenue in the City of Portland, Oregon, and also the Ford automobile, the house and lot located at said address being held in the joint names of said Herman R. Biersdorf, deceased, and said Phoebe D. Biersdorf, is an estate by the entirety and under the law goes to the survivor, Phoebe D. Biersdorf.

"It is further agreed that the said children of said Herman R. Biersdorf, deceased, will pay the expense of administration of said deceased out of their funds of said estate, including funeral expenses and expense of last illness.

"Dated June 4, 1945.

> "Phoebe D. Biersdorf
> Lillian B. Putnam
> Mabel L. Biersdorf and
> Inez E. Rice
>     By Lillian B. Putnam
> Edgar A. Biersdorf
> Verna E. Ludtke"

Appellant is the widow of Dr. Biersdorf. Respondents are his children by a former marriage.

Dr. Biersdorf died June 1, 1945, intestate, leaving an estate consisting of personal property inventoried in excess of $30,000. He was buried on June 4, 1945; and, either in the afternoon or in the evening of the day of the funeral (the time is in dispute), Lillian Putnam, Edgar A. Biersdorf and Verna E. Ludtke, with their attorney, Henry Hartje, called upon appellant at her home in the City of Portland. After some conversation regarding the funeral and the affairs of Dr. Biersdorf's estate, the contract in suit was drawn up by Mr. Hartje in longhand and signed by appellant, by Lillian B. Putnam, Edgar A. Biersdorf, Verna E. Ludtke, and in

addition thereto Lillian B. Putnam signed the names of Mabel L. Biersdorf and Inez E. Rice by herself.

There is a sharp conflict in the evidence as to the circumstances of this call at the home of appellant as well as to the conversation which took place at the time. It is impossible to reconcile the testimony of the parties. There is the testimony of appellant giving her version of what took place, and there is arrayed against her, giving an entirely different version, the testimony of Mrs. Putnam, Mrs. Ludtke, Mr. Biersdorf and Mr. Hartje. If it were necessary to determine from this record the truth of what actually took place at this meeting, the problem would be most difficult. I believe, however, that the issues involved herein can be disposed of without the necessity of analyzing all of this testimony and of deciding who told the truth and who falsified as to the happenings at this meeting.

There are certain matters about which there is no dispute. It is admitted that the funeral of Dr. Biersdorf took place in one of the mortuaries in the City of Portland, commencing about 11:30 and concluding about 1:30 or 2:00 o'clock on the 4th of June. It is admitted that either during the afternoon or that evening, the three respondents referred to above and their attorney, Mr. Hartje, called upon appellant at her home, and that there was a discussion there about the affairs of Dr. Biersdorf. It is admitted that from appellant's standpoint she was alone and from respondents' standpoint that three of them were present represented by an attorney. It is admitted that the attorney, Mr. Hartje, in explaining the matter to appellant did say that it was necessary to conclude the matter in something of a hurry for the reason that one of the respondents was leaving the next day. It is admitted that Mr. Hartje

drew up the contract in longhand and that he was at that time and continued to act as attorney for respondents. It is thoroughly established that the parties went to the appellant's place to get an agreement.

According to the testimony of respondents who were present and Mr. Hartje, appellant had a very erroneous notion as to what were her rights in Dr. Biersdorf's estate, they contending that she stated she was entitled to a third thereof. While she denied this, it is admitted that Mr. Hartje did not disabuse her mind of this erroneous notion and did not explain to her that she would be entitled to half of the personal property rather than a third thereof. It is admitted that the monetary consideration recited in the contract was not paid. There is no contention made by respondents that Mr. Hartje advised appellant of her rights to a widow's allowance or as to exempt property. Regardless of who was telling the true story as to the events which took place at this meeting, it is conclusively established by all the testimony that appellant did not understand her rights as the widow of Dr. Biersdorf. She did not even understand what were her rights as a tenant by the entirety in the home, and at her request that provision was inserted in the contract by Mr. Hartje.

One other observation should be made at this point. If the conversation at the time of this meeting was as narrated by respondents who were present and Mr. Hartje, then it must be admitted that Mr. Hartje failed considerably in drawing the contract. According to their version, the reason for the contract was that there had been a pre-marriage contract between appellant and Dr. Biersdorf, which had not been reduced to writing, and that this contract was an embodiment or confirmation of this agreement. Yet there is not a suggestion

in the contract that such was the fact. According to this version, appellant was to get the personal property and the car. The contract does not provide for this. By the contract itself, appellant does not relinquish her right to act as administratrix, yet it is admitted that on the following day Mr. Hartje had Mrs. Putnam appointed as administratrix without further consulting appellant.

The evidence further fully establishes the fact that appellant was relying entirely upon the good faith and belief of friendliness on the part of respondents and Mr. Hartje, and the evidence shows that before they left she went to Dr. Biersdorf's safe and got his private papers and, without examining them to ascertain what they were, turned them over to Mr. Hartje.

It is admitted that there was a discussion regarding a will which gave the property to the children. There is a sharp dispute as to what was said regarding the legal effect of this will. It is further admitted that Dr. Biersdorf discussed with Mr. Hartje, his attorney, his intended marriage to appellant and was fully advised as to his rights and what he should do with reference to a disposition of his property should the marriage be solemnized. The record further shows that after the marriage he again consulted his attorney regarding the making of a will.

Now with this much of the record before us, let us consider the contract and appellant's challenges thereto. Appellant challenges this contract and attempts to have it set aside and cancelled upon the ground that the same was obtained by respondents and their attorney by fraud, duress, undue influence and without giving any consideration to appellant therefor.

What were appellant's rights in this estate? Under § 19-603, O. C. L. A., she was entitled to a widow's al-

lowance for one year, which, under the circumstances of this case, would equal at least $1,800. She was entitled to all exempt property. The homestead is not involved because the home was held by the entirety. But, as to personal property, under §§ 6-1201 and 19-602, O. C. L. A., she was entitled to books, pictures and musical instruments to the value of $75, wearing apparel to the value of $100, automobile to the value of $400, household goods to the extent of $300. Thus it will appear from these various items that she would have been entitled to receive $2,675. Then, under § 16-102, O. C. L. A., subdivision (4), she would have been entitled to one-half of the remainder. In order to arrive at the amount of this item, the items above must be deducted, together with other expenses of administration, funeral expenses, etc. After these deductions, her interest in the remainder of the estate would have been about $12,500, or, in round numbers, she was entitled to approximately $15,000 from this estate as the widow of Dr. Biersdorf.

Respondents contend that in this case it would be inequitable for the widow to receive what we have outlined above, because she had only been married to Dr. Biersdorf since April 11th. We have been cited no case, and, after a rather careful investigation, we have found none holding that the rights of a widow in her deceased husband's estate are to be measured by the time of the marriage relationship. The statutes to which we have referred above, giving to appellant the rights referred to, do not provide that the rights there defined depend upon the length of time of the marriage relationship. Those statutes provide that if there is a widow she shall have those rights. It is admitted that appellant is Dr. Biersdorf's widow. The argument that the length of time of the marriage relationship should

influence the amount of the widow's right in her deceased husband's estate is an argument that must be addressed to the legislature. It is an argument that the courts cannot entertain in view of these positive statutory provisions.

Now, the contract is challenged for lack of consideration. What was the consideration for this contract? The agreement itself provides that the respondents will pay the expenses of administration out of their funds of said estate, including funeral expenses and expenses of last illness. Of course, all these items are preferred claims against the estate. § 19-1102, O. C. L. A. This was in no sense a benefit to appellant nor a detriment to respondents. The contract does not give appellant the furniture nor the automobile, but the record shows that it was agreed at the time of this meeting that she should have both. The value of these items is approximately $1,600. Four hundred thirty dollars worth of the furniture was bought and paid for by appellant. Three hundred dollars worth of the furniture is exempt. Four hundred dollars of the automobile is exempt. This would leave $470, half of which appellant would have received under the law. Thus it may be said that she would have received, by virtue of the arrangement agreed upon by the parties at her home, $235. This, of course, would depend upon the enforcibility of the arrangement. It will be remembered that there was a written agreement which did not give to her either of these items. Two of the heirs were not present at the time of this arrangement, and no authority to represent them is shown. Nevertheless, we shall assume without deciding that there was some consideration for the contract.

Let us now inquire into the question of whether or

not that consideration was adequate under all of the circumstances of this case.

Kerr on Fraud and Mistake (1910) 184, states this rule:

> "Mere inadequacy of consideration or inequality in a bargain is not a ground to set aside a transaction, if the parties were on equal terms and in a situation to judge for themselves, and performed the act wittingly and willingly. * * * But inadequacy of consideration, if it be of so gross a nature as to amount in itself to evidence of fraud, is a ground for cancelling a transaction. In such cases the relief is granted, not on the ground of the inadequacy of consideration, but on the ground of fraud as evidenced thereby. * * * "

3 Pomeroy's Equity Jurisprudence (5th ed. 1941) § 927 treats the same subject in this language:

> "Although the actual cases in which a contract or conveyance has been canceled on account of gross inadequacy merely, without other inequitable incidents, are very few, yet the doctrine is settled, by a consensus of decisions and *dicta,* that even in the absence of all other circumstances, when the inadequacy of price is so gross that it shocks the conscience, and furnishes satisfactory and decisive evidence of fraud, it will be a sufficient ground for canceling a conveyance or contract, whether executed or executory. Even then fraud, and not inadequacy of price, is the true and only cause for the interposition of equity and the granting of relief. * * *
>
> "The rule is sometimes stated that the inadequacy must be so gross that it is conclusive evidence of fraud. Fraud is, however, a *fact,* inferred, like other conclusions of fact, from the evidence. No rule of law can therefore be laid down as to the amount of inadequacy necessary to produce the resulting fraud. Inadequacy of consideration may

be evidence of fraud, slight or powerful, according to its amount, and other circumstances.

"The following seems to be the true rationale of the doctrines concerning inadequacy of price: Whenever it appears that the parties have knowingly and deliberately fixed upon any price, however great or however small, there is no occasion or reason for interference by courts, for owners have a right to sell property for what they please, and buyers have a right to pay what they please. But where there is no evidence of such knowledge, intention, or deliberation by the parties, the disproportion between the value of the subject-matter and the price may be so great as to warrant the court in inferring therefrom the *fact* of fraud. Such a gross inadequacy or disproportion will call for explanation, and will shift the burden of proof upon the party seeking to enforce the contract, and will require him to show affirmatively that the price was the result of a deliberate and intentional action by the parties * * * ."

This court has had occasion to refer to this subject, in the case of *Sherman v. Glick,* 71 Or. 451, 461, 142 P. 606, where we said:

"Inadequacy of price paid for real property is not sufficient alone to authorize a court of equity to set aside a deed of conveyance, unless it is so gross as to shock a conscientious person; but, if the inadequacy is so great as to shock a conscientious person, it alone may furnish sufficient ground for annulling the conveyance. When the price paid is inadequate, but not grossly so, such inadequacy, with other inequitable incidents, may afford proper grounds for relief."

To the same effect is *Toney v. Toney,* 84 Or. 310, 318, 165 P. 221, and *Archer v. Lapp,* 12 Or. 196, 202.

The court in its opinion quotes from 1 Williston on Contracts (rev. ed.) 285, § 115, to the effect that "the

law will not enter into an inquiry as to the adequacy of the consideration." Equity will. This is a suit in equity. If the quotation is intended to prescribe a rule applicable to this case, it is out of harmony with the above cases from this court and should not be followed.

In this case the inadequacy of consideration is accompanied by the admitted facts referred to above. That the parties were not dealing on equal terms is demonstrated by the fact that respondents, three in number, were present represented by their attorney, and that appellant was alone without counsel. That there was haste in closing the transaction is admitted. That she requested further consideration of the matter until the following morning is not denied. That she was ignorant of her rights in and to her deceased husband's estate is clear. That the erroneous notions she had regarding the matter were not corrected by the attorney present is admitted. The fact that on the following morning when she was advised of her legal rights she immediately repudiated the contract is admitted. While there is an effort upon the part of three respondents and Mr. Hartje to say that appellant was not distressed in mind as the result of the sudden death of her husband, yet all nature arises to contradict this testimony and to corroborate the statements of appellant that she was "deeply depressed." Under the circumstances, this court ought not place its stamp of approval upon a contract procured in the manner in which this contract was procured.

Such a disposition of this case would be an invitation to other heirs and other lawyers to congregate en masse and take advantage of distressed widows. The transaction was so one-sided as to numbers present, legal representation, knowledge and legal effect of what was

being done, as well as to consideration, as not only to shock, but literally to stun, the conscience of a court of equity. Equality is equity. 21 C. J. 206, § 207. These circumstances portray the opposite of equality. They give a fraudulent color to the entire transaction.

Let us apply a common sense test to the validity of this contract. Would the parties have made this contract had all these inequalities been removed? In other words, had the parties met on some neutral ground not in the home from which Dr. Biersdorf had so recently been carried to his grave; had appellant been accompanied by two of her relatives and her attorney; had she been advised of her exact status as such widow and as to her rights in connection with the estate by the entirety; and, if there were anything said about an oral antenuptial agreement, then had she been told that such an agreement was not binding upon her and that she was entitled to disregard it and take what the law gave her as such surviving widow, would she have made this contract? The answer is obvious. The very next morning when she had an opportunity to shake off the influence of what she had before believed was friendship, sympathy and sound legal advice, she immediately repudiated the contract.

If there were an oral antenuptial agreement and if Dr. Biersdorf had such confidence in appellant that he did not execute a new will on account thereof, and if at this meeting after the funeral appellant did say, as Lillian B. Putnam, Edgar A. Biersdorf and Verna D. Ludtke and Henry Hartje testified she said, and as she testified she did not say, namely, that she would respect this agreement, then why in the name of fair dealing and common decency was it necessary to get appellant's signature to this or any other contract? If she could be trusted that far, why could she not be trusted

further? If people want valid enforcible contracts, they should be obtained under far different circumstances.

Even the trial court's conscience was shocked. He stated: "Certainly for three adult persons accompanied by their attorney to call upon a widow the day of the burial of her husband to secure an advantageous contract, coupled with the inadequacy of consideration, under ordinary circumstances would be sufficient in the eyes of a court of equity to set aside a contract such as this." And again: "With respect to the matter of consideration, if she was legally entitled to the house and a half of the personal property belonging to the estate of course the consideration is not adequate."

Notwithstanding these impressions, the trial court sustained the contract on this reasoning: "Had this been a widow who had been married to this man a great many years and participated in the creation of this estate it would appear entirely different to the Court, but in this case what she did receive which she wouldn't have been entitled to under the law is substantial in view of the short time she was married to the deceased * * * ." Not even the opinion of the court attempts to justify any such fallacious reasoning.

Again, let us look at this transaction from the standpoint of a few fundamental principles. So often we venture out into the realm of adjudicated cases and almost lose sight of the fundamentals of the law. "A contract, to be a contract, must be binding upon both parties. There must be mutuality. This is an axiom of law." *Shea v. Graves*, 142 Or. 503, 517, 19 P. (2d) 406. 17 C. J. S. 358.

At the time the contract was made and signed, only three out of five heirs of Dr. Biersdorf were present and participated in the proceedings. The names of two of the heirs are signed by Lillian B. Putnam, to-wit, Mabel

L. Biersdorf and Inez E. Rice. Under the record in this case, it was wholly impossible for Mrs. Putnam to have authority to make such a contract for these other heirs, nor does she claim any such authority. The nature of the negotiations, as related by all the witnesses, was such that Mabel L. Biersdorf and Inez E. Rice could not have known thereof in advance and authorized any such action. Therefore, the contract lacked mutuality.

Let us suppose, to illustrate, that the contract had been very advantageous to appellant rather than respondents, could she have compelled Mabel L. Biersdorf and Inez E. Rice to comply with the terms thereof on the record made in this case? There isn't a scintilla of evidence in this record to show authority to sign the names of these heirs or to show that these heirs ever ratified or concurred in this agreement. They never even appeared as witnesses to sustain the contract.

Now, under these circumstances, the contract could not have risen above a mere offer, an offer which could have been withdrawn at any time before it was accepted. 17 C. J. S. 395, and cases cited in note 31. Such an offer may be revoked at any time before it is accepted by all of the parties thereto. *Burton v. Shotwell,* (13 Bush) 76 Ky. 271; 17 C. J. S. 396; 13 C. J. 293. This record shows no more than negotiations resulting in an offer upon the part of appellant to make the kind of a deal outlined in this proposition. This offer never became binding until it was accepted by all the parties. It was repudiated before it was ever accepted or ratified by two of the heirs.

For these reasons I cannot concur in the opinion of the court. I feel that the decree should be reversed and one entered herein cancelling, setting aside and holding for naught the document in suit.